CONSOLIDATED RAIL CORPORATION *v.* DARRONE,
ADMINISTRATRIX OF THE ESTATE
OF LeSTRANGE

No. 82–862.   Argued November 29, 1983—Decided February 28, 1984

POWELL, J., delivered the opinion for a unanimous Court.

*Harry A. Rissetto* argued the cause for petitioner. With him on the briefs were *Dennis J. Morikawa* and *Dennis Alan Arouca.*

*Joseph P. Lenahan* argued the cause for respondent. With him on the brief were *Jack Greenberg, Beth Lief,* and *Eric Schnapper.*

*Assistant Attorney General Reynolds* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Lee, Deputy Solicitor General Bator, Deputy Assistant Attorneys General Cooper* and *Wilkinson, John H. Garvey, Brian K. Landsberg,* and *Joan A. Magagna.**

---

*\*Robert E. Williams, Douglas S. McDowell,* and *Edward E. Potter* filed a brief for the Equal Employment Advisory Council as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Council of the Blind et al. by *Arlene Brynne Mayerson;* for the American Federation of State, County and Municipal Employees et al. by *Larry J. Goldberg* and *Marc P. Charmatz;* and for Senator Alan Cranston et al. by *Allen R. Snyder.*

JUSTICE POWELL delivered the opinion of the Court.

This case requires us to clarify the scope of the private right of action to enforce § 504 of the Rehabilitation Act of 1973, 87 Stat. 394, as amended, 29 U. S. C. § 794 (1982 ed.), that prohibits discrimination against the handicapped by federal grant recipients. There is a conflict among the Circuits.

I

The Rehabilitation Act of 1973 establishes a comprehensive federal program aimed at improving the lot of the handicapped. Among its purposes, as originally stated, were to "promote and expand employment opportunities in the public and private sectors for handicapped individuals and to place such individuals in employment." 29 U. S. C. § 701(8). To further these purposes, Congress enacted § 504 of the Act. That section provides:

> "No otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

The language of the section is virtually identical to that of § 601 of Title VI of the Civil Rights Act of 1964, 78 Stat. 252, 42 U. S. C. § 2000d, that similarly bars discrimination (on the ground of race, color, or national origin) in federally assisted programs.

In 1978, Congress amended the Rehabilitation Act to specify the means of enforcing its ban on discrimination. In particular, § 505(a)(2), as added, 92 Stat. 2982, 29 U. S. C. § 794a(a)(2) (1982 ed.), made available the "remedies, procedures, and rights set forth in title VI of the Civil Rights Acts of 1964" to victims of discrimination in violation of § 504 of the Act.[1]

---

[1] Section 505(a)(2), as set forth in 29 U. S. C. § 794a(a)(2) (1982 ed.), provides in full: "The remedies, procedures, and rights set forth in title VI of

Petitioner, Consolidated Rail Corporation (Conrail), was formed pursuant to Subchapter III of the Regional Rail Reorganization Act of 1973, 87 Stat. 1004, 45 U. S. C. § 701 *et seq.* The Act, passed in response to the insolvency of a number of railroads in the Northeast and Midwest, established Conrail to acquire and operate the rail properties of the insolvent railroads and to integrate these properties into an efficient national rail transportation system. Under § 216 of the Act, 90 Stat. 89, as amended, 45 U. S. C. § 726 (1976 ed. and Supp. V), the United States, acting through the United States Railway Association, purchases debentures and series A preferred stock of the corporation "at such times and in such amounts as may be required and requested by the Corporation," but "in accordance with the terms and conditions . . . prescribed by the Association . . . ." § 726(b)(1). The statute permits the proceeds from these sales to be devoted to maintenance of rail properties, capital needs, refinancing of indebtedness, or working capital. *Ibid.* Under this statutory authorization, Conrail has sold the United States $3.28 billion in securities. See App. A–15.

Conrail also received federal funds under Subchapter V of the Act, now repealed, to provide for reassignment and retraining of railroad workers whose jobs were affected by the reorganization. And Conrail now receives federal funds under § 1143(a) of the Northeast Rail Service Act of 1981, 95 Stat. 662, 45 U. S. C. § 797a (1976 ed., Supp. V), that provides termination allowances of up to $25,000 to workers who lose their jobs as a result of reorganization.

---

the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."

Section 505(a)(1) generally makes available the remedies of Title VII of the Civil Rights Act to persons aggrieved by violation of § 501 of the Rehabilitation Act, which governs the Federal Government's employment of the handicapped.

## II

In 1979, Thomas LeStrange filed suit against petitioner for violation of rights conferred by § 504 of the Rehabilitation Act.[2] The complaint alleged that the Erie Lackawanna Railroad, to which Conrail is the successor in interest, had employed the plaintiff as a locomotive engineer; that an accident had required amputation of plaintiff's left hand and forearm in 1971; and that, after LeStrange was disabled, the Erie Lackawanna Railroad, and then Conrail, had refused to employ him although it had no justification for finding him unfit to work.

The District Court, following the decision of *Trageser* v. *Libbie Rehabilitation Center, Inc.*, 590 F. 2d 87 (CA4 1978), cert. denied, 442 U. S. 947 (1979), granted petitioner's motion for summary judgment on the ground that the plaintiff did not have "standing" to bring a private action under § 504. *LeStrange* v. *Consolidated Rail Corporation*, 501 F. Supp. 964 (MD Pa. 1980).[3] In *Trageser*, the Fourth Circuit had held that § 505(a)(2) of the Rehabilitation Act incorporated into that Act the limitation found in § 604 of Title VI, which provides that employment discrimination is actionable only when the employer receives federal financial assistance the "primary objective" of which is "to provide employment." The District Court concluded that the aid provided to petitioner did not satisfy the "primary objective" test.[4]

---

[2] Respondent, the administratrix of LeStrange's estate, was substituted as a party before this Court upon the death of LeStrange.

[3] The District Court also dismissed constitutional claims raised by LeStrange.

[4] Under the analysis of *Trageser*, a private plaintiff also may have "standing" to sue for employment discrimination if he can show "that discrimination in employment necessarily causes discrimination against" the intended beneficiaries of the federal aid, even where that aid itself was not intended to further employment. App. to Pet. for Cert. 33. The District Court found as well that this prong of the *Trageser* test was not satisfied here.

The Court of Appeals reversed and remanded to the District Court. *LeStrange* v. *Consolidated Rail Corporation*, 687 F. 2d 767 (CA3 1982). There was no opinion for the court, but all three judges of the panel agreed that the cause of action for employment discrimination under § 504 was not properly limited to situations "where a primary objective of the Federal financial assistance is to provide employment." Judge Bloch, noting that *North Haven Board of Education* v. *Bell*, 456 U. S. 512 (1982), had construed Title IX to create a private cause of action for employment discrimination in all federally funded education programs, concluded that the language and legislative history of § 504 required the same broad construction of that section. Judge Adams, concurring in the judgment, found the result compelled by *North Haven Board of Education* and by the Third Circuit's decision in *Grove City College* v. *Bell*, 687 F. 2d 684 (1982), aff'd, *ante*, p. 555.[5] Judge Weis, concurring, argued that Congress had not intended the Rehabilitation Act to incorporate Title VI's "primary objective" limitation: that limitation was designed to temper the Government's decision to terminate federal funds, a decision that has more drastic consequences for the funded programs than do private suits for individual relief.

We granted certiorari to resolve the conflict among the Circuits and to consider other questions under the Rehabilitation Act.[6] 459 U. S. 1199 (1983). We affirm.

---

[5] The Court of Appeals for the Third Circuit had held in *Grove City College* that an entire educational institution is subject to the antidiscrimination provisions of Title IX of the Education Amendments of 1972 if any department of the institution receives federal aid.

[6] Three other Courts of Appeals have agreed substantially with the Fourth Circuit decision in *Trageser*. See *Scanlon* v. *Atascadero State Hospital*, 677 F. 2d 1271 (CA9 1982); *United States* v. *Cabrini Medical Center*, 639 F. 2d 908 (CA2 1981); *Carmi* v. *Metropolitan St. Louis Sewer District*, 620 F. 2d 672 (CA8), cert. denied, 449 U. S. 892 (1980).

## III

We are met initially by petitioner's contention that the death of the plaintiff LeStrange has mooted the case and deprives the Court of jurisdiction for that reason.[7]  Petitioner concedes, however, that there remains a case or controversy if LeStrange's estate may recover money that would have been owed to LeStrange.[8]  Without determining the extent to which money damages are available under § 504, we think it clear that § 504 authorizes a plaintiff who alleges intentional discrimination to bring an equitable action for backpay.  The case therefore is not moot.

In *Guardians Assn.* v. *Civil Service Comm'n of New York City,* 463 U. S. 582 (1983), a majority of the Court expressed the view that a private plaintiff under Title VI could recover backpay; and no Member of the Court contended that backpay was unavailable, at least as a remedy for intentional discrimination.[9]  It is unnecessary to review here the grounds

---

[7] In addition, Conrail argued below, and again in its opening brief, that § 504 does not create a private right of action for employment discrimination.  This argument was abandoned at page 3 of Conrail's reply brief.  See also Tr. of Oral Arg. 13.  In view of this concession it is unnecessary to address the question here beyond noting that the courts below relied on *Cannon* v. *University of Chicago,* 441 U. S. 677 (1979), in holding that such a private right exists under § 504.

[8] Petitioner also concedes that respondent, as representative of LeStrange's estate, may assert any right to monetary relief under § 504 that was possessed by LeStrange.

[9] A majority of the Court agreed that retroactive relief is available to private plaintiffs for all discrimination, whether intentional or unintentional, that is actionable under Title VI.  JUSTICE MARSHALL, and JUSTICE STEVENS, joined by JUSTICES BRENNAN and BLACKMUN, argued that both prospective and retroactive relief were fully available to Title VI plaintiffs.  463 U. S., at 624–634, 635–639.  JUSTICE O'CONNOR agreed that both prospective and retroactive equitable relief were available, while reserving judgment on the question whether there is a private cause of action for damages relief under Title VI.  *Id.,* at 612, n. 1.  JUSTICE WHITE, joined by JUSTICE REHNQUIST, while contending that only relief ordering future compliance with legal obligations was available in other private actions under Title VI, put aside the situation of the private plaintiff who alleged

for this interpretation of Title VI. It suffices to state that we now apply this interpretation to § 505(a)(2), which, as we have noted, provides to plaintiffs under § 504 the remedies set forth in Title VI. Therefore, respondent, having alleged intentional discrimination, may recover backpay in the present § 504 suit.[10]

## IV

### A

The Court of Appeals rejected the argument that petitioner may be sued under § 504 only if the primary objective of the federal aid that it receives is to promote employment. Conrail relies particularly on § 604 of Title VI. This section limits the applicability of Title VI to "employment practice[s] . . . where a *primary objective* of the Federal financial assistance is to provide employment" (emphasis added).[11] As noted above, § 505(a)(2) of the Rehabilitation Act, as added in 1978, adopted the remedies and rights provided in Title VI. Accordingly, Conrail's basic position in this case is that

---

intentional discrimination. *Id.*, at 597. THE CHIEF JUSTICE and JUSTICE POWELL did not reach the question, as they would have held that petitioners in that case had no private right of action and had not made the showing of intentional discrimination required to establish a violation of Title VI. *Id.*, at 608–611.

[10] Although the legislative history of the 1978 amendments does not explicitly indicate that Congress intended to preserve the full measure of courts' equitable power to award backpay, the few references to the question are consistent with our holding. Congress clearly intended to make backpay available to victims of discrimination by the Federal Government, see S. Rep. No. 95–890, p. 19 (1978); and statements made in relation to subsequent legislation by the Senate Committee on Labor and Human Resources, the Committee responsible for the 1978 amendments, endorse the availability of backpay. S. Rep. No. 96–316, pp. 12–13 (1979).

[11] Section 604 provides in full: "Nothing contained in this title shall be construed to authorize action under this title by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment." 78 Stat. 253, 42 U. S. C. § 2000d–3.

§ 604's limitation was incorporated expressly into the Rehabilitation Act. The decision of the Court of Appeals therefore should be reversed, Conrail contends, as the primary objective of the federal assistance received by Conrail was not to promote employment.

It is clear that § 504 itself contains no such limitation. Section 504 neither refers explicitly to § 604 nor contains analogous limiting language; rather, that section prohibits discrimination "against the handicapped under *"any* program or activity receiving Federal financial assistance."* And it is unquestionable that the section was intended to reach employment discrimination.[12] Indeed, enhancing employment of the handicapped was so much the focus of the 1973 legislation that Congress the next year felt it necessary to amend the statute to clarify whether § 504 was intended to prohibit other types of discrimination as well. See § 111(a), Pub. L. 93–516, 88 Stat. 1619, amending 29 U. S. C. § 706(6); S. Rep. No. 93–1297, p. 37 (1974).[13] Thus, the language of § 504 sug-

---

[12] Congress recognized that vocational rehabilitation of the handicapped would be futile if those who were rehabilitated could not obtain jobs because of discrimination. Employment discrimination thus would have "a profound effect on the provision of relevant and effective [rehabilitation] services." 119 Cong. Rec. 5862 (1973) (remarks of Sen. Cranston). See, *e. g.*, S. Rep. No. 93–318, p. 4 (1973); 119 Cong. Rec. 24587 (1973) (remarks of Sen. Taft); *id.*, at 24588 (remarks of Sen. Williams). Several other sections of Title V of the Rehabilitation Act also were aimed at discrimination in employment: § 501 and § 503 require all federal employers and federal contractors to adopt affirmative-action programs for the handicapped.

[13] We note further that the Court in an analogous statutory context rejected the contention that the terms used in § 504 implicitly contain a "primary objective" limitation. Section 901 of Title IX, like § 504, borrowed the language of § 601 of Title VI. *North Haven Board of Education* v. *Bell*, 456 U. S. 512 (1982), found, however, that Title IX's prohibition of employment discrimination did not incorporate § 604's "primary objective" requirement. The Court stated that, had Congress wished so to limit Title IX, it would have enacted in that Title counterparts to both § 601 and § 604. *Id.*, at 530.

Petitioner suggests that *North Haven* is inapplicable to the construction of § 504 because the Congress considered but rejected a provision explicitly

gests that its bar on employment discrimination should not be limited to programs that receive federal aid the primary purpose of which is to promote employment.

The legislative history, executive interpretation, and purpose of the 1973 enactment all are consistent with this construction. The legislative history contains no mention of a "primary objective" limitation, although the legislators on numerous occasions adverted to § 504's prohibition against

---

incorporating the language of § 604 of Title VI into Title IX. And other aspects of the legislative history also supported the Court's interpretation of § 901, see *id.*, at 523–529. In contrast, Congress did not advert to a "primary objective" limitation when drafting § 504.

Clearly, petitioner's observations do not touch on that aspect of *North Haven*—its analysis of the language of § 601—that is relevant to the present case. But even without the analysis of *North Haven*, petitioner's interpretation of § 504's language is unfounded. For language as broad as that of § 504 cannot be read in isolation from its history and purposes. See, *e. g., Chapman* v. *Houston Welfare Rights Org.*, 441 U. S. 600, 608 (1979); *Philbrook* v. *Glodgett*, 421 U. S. 707, 713 (1975). In these respects, § 504 differs from Title VI in ways that suggest that § 504 cannot sensibly be interpreted to ban employment discrimination only in programs that receive federal aid the "primary objective" of which is to promote employment. The "primary objective" limitation of Title VI gave the antidiscrimination provision of that Title a scope that well fits its underlying purposes—to ensure that "funds of the United States are not used to support racial discrimination" but "are spent in accordance with the Constitution and the moral sense of the Nation." 110 Cong. Rec. 6544 (1964) (remarks of Sen. Humphrey). As the Court of Appeals observed, it was unnecessary to extend Title VI more generally to ban employment discrimination, as Title VII comprehensively regulates such discrimination.

In contrast, the primary goal of the Act is to increase employment of the handicapped, see *supra*, at 632, and n. 12. However, Congress chose to ban employment discrimination against the handicapped, not by all employers, but only by the Federal Government and recipients of federal contracts and grants. As to the latter, Congress apparently determined that it would require contractors and grantees to bear the costs of providing employment for the handicapped as a *quid pro quo* for the receipt of federal funds. Cf. 118 Cong. Rec. 32305 (1972) (remarks of Sen. Javits). But this decision to limit § 504 to the recipients of federal aid does not require us to limit that section still further, as petitioner urges.

discrimination in employment by programs assisted with federal funds. See, *e. g.*, S. Rep. No. 93–318, pp. 4, 18, 50, 70 (1973); 119 Cong. Rec. 5862 (1973) (remarks of Sen. Cranston); *id.*, at 24587–24588 (remarks of Sen. Williams, Chairman of the Committee on Labor and Public Welfare). Moreover, the Department of Health, Education, and Welfare, the agency designated by the President to be responsible for coordinating enforcement of § 504, see Exec. Order No. 11914, 3 CFR 117 (1977), from the outset has interpreted that section to prohibit employment discrimination by all recipients of federal financial aid, regardless of the primary objective of that aid.[14] This Court generally has deferred to contemporaneous regulations issued by the agency responsible for implementing a congressional enactment. See, *e. g.*, *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 274–275 (1974). The regulations particularly merit deference in the present case: the responsible congressional Committees participated in their formulation, and both these Committees and Congress itself endorsed the regulations in their final form.[15] Finally, application of § 504 to all programs receiving federal financial assistance fits the remedial purpose of the Rehabilitation Act to "promote and expand employment opportunities" for the handicapped. 29 U. S. C. § 701(8).

[14] See 39 Fed. Reg. 18562, 18582 (1974) (revising pre-existing provisions to implement § 504); 41 Fed. Reg. 29548, 29552, 29563 (1976) (proposed Department regulations), promulgated, 42 Fed. Reg. 22678 (§ 84.2), 22680 (§ 84.11), 22688 ("Employment Practices") (1977); 43 Fed. Reg. 2132, 2138 (1978) (final coordinating regulations).

The Department of Justice, now responsible for coordinating agency implementation of § 504, see Exec. Order No. 12250, 3 CFR 298 (1981), adopted the HEW guidelines, 46 Fed. Reg. 40686 (1981). The Department of Transportation, from which Conrail receives federal aid, also has construed § 504 to prohibit employment discrimination in all programs receiving federal financial assistance. 44 Fed. Reg. 31442, 31468 (1979), codified at 49 CFR pt. 27 (1983). See § 27.31.

[15] See S. Rep. No. 93–1297, p. 25 (1974). In adopting § 505(a)(2) in the amendments of 1978, Congress incorporated the substance of the Department's regulations into the statute. See n. 16, *infra.*

## B

Nor did Congress intend to enact the "primary objective" requirement of § 604 into the Rehabilitation Act when it amended that Act in 1978. The amendments, as we have noted, make "available" the remedies, procedures, and rights of Title VI for suits under § 504 against *"any* recipient of Federal assistance." § 505(a)(2), 29 U. S. C. § 794a(a)(2) (1982 ed.). These terms do not incorporate § 604's "primary objective" limitation. Rather, the legislative history reveals that this section was intended to codify the regulations of the Department of Health, Education, and Welfare governing enforcement of § 504, see S. Rep. No. 95–890, p. 19 (1978), that prohibited employment discrimination regardless of the purpose of federal financial assistance.[16] And it would be anomalous to conclude that the section, "designed to enhance the ability of handicapped individuals to assure compliance with [§ 504]," *id.*, at 18, silently adopted a drastic limitation on the handicapped individual's right to sue federal grant recipients for employment discrimination.

## V

Section 504, by its terms, prohibits discrimination only by a "program or activity receiving Federal financial assistance." This Court on two occasions has considered the meaning of the terms "program or activity" as used in Title

---

[16] The Committee noted: "[T]he regulations promulgated by the Department of Health, Education, and Welfare with respect to procedures, remedies, and rights under § 504 conform with those promulgated under title VI. Thus, this amendment codifies existing practice as a specific statutory requirement." S. Rep. No. 95–890, p. 19 (1978). Although these Department regulations incorporated Title VI regulations governing "complaint and enforcement procedures," see 42 Fed. Reg. 22685, 22694–22701 (1977), the regulations implementing § 504 did not incorporate § 80.3 of the Title VI regulations, which limit Title VI's application to employment discrimination in federal programs to increase employment. The § 504 regulations banned employment discrimination in programs receiving any form of federal financial assistance. See n. 14, *supra.*

IX. *Grove City College* v. *Bell, ante,* p. 555; *North Haven Board of Education* v. *Bell,* 456 U. S. 512, 535–540 (1982). Clearly, this language limits the ban on discrimination to the specific program that receives federal funds. Neither opinion, however, provides particular guidance as to the appropriate treatment of the programs before us. *Grove City College* considered grants of financial aid to students. The Court specifically declined to analogize these grants to nonearmarked direct grants and, indeed, characterized them as "*sui generis.*" *Ante,* at 573. *North Haven Board of Education* did not undertake to define the term "program" at all, finding that, in the procedural posture of that case, that task should be left to the District Court in the first instance.[17] 456 U. S., at 540.

The procedural posture of the case before us is the same as that of *North Haven Board of Education.* The District Court granted a motion for summary judgment on grounds unrelated to the issue of "program specificity." That judgment was reversed by the Court of Appeals and the case was remanded for further proceedings. Thus, neither the District Court nor the Court of Appeals below considered the question whether respondent's decedent had sought and been denied employment in a "program . . . receiving Federal financial assistance."[18] Nor did the District Court develop the record or make the factual findings that would be required to define the relevant "program." We therefore do not consider whether federal financial assistance was received by the "program or activity" that discriminated against LeStrange.[19]

---

[17] The Court held that the Court of Appeals in that case had erroneously suggested that HEW regulations issued under Title XI to govern employment discrimination need not be program specific. See 456 U. S., at 536.

[18] Although Judge Adams cited the Third Circuit opinion in *Grove City College,* he did so merely to support his rejection of the *Trageser* "standing" analysis. See *supra,* at 629.

[19] Conrail does not contest that it receives federal financial assistance within the meaning of § 504. Apparently, the Government's payments to Conrail exceed the fair market value of the securities issued by Conrail to the Government. Tr. of Oral Arg. 18.

## VI

We conclude that respondent may recover backpay due to her decedent under § 504 and that this suit for employment discrimination may be maintained even if petitioner receives no federal aid the primary purpose of which is to promote employment. The judgment of the Court of Appeals is therefore affirmed.

*It is so ordered.*