Albert Claude PARKER, Plaintiff,

v.

Michael P. LANE, et al., Defendants.

No. 86 C 6423.

United States District Court,
N.D. Illinois, E.D.

May 19, 1988.

James C. Murray, Jr., Brian A. Bosch, Katten Muchin & Zavis, Chicago, Ill., for plaintiff.

Richard M. Carbonara, Asst. Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Albert Claude Parker ("Parker") sues several officials of the Illinois Department of Corrections ("Department") under 42 U.S.C. § 1983 ("Section 1983"), claiming they deprived him of due process when they moved him from the Honor Dormitory to the general population while he was a prisoner at Joliet Correctional Center ("Joliet"). All defendants have moved under Fed.R.Civ.P. ("Rule") 12(b)(6) to dismiss the Complaint for failure to state a claim on which relief may be granted. For the reasons stated in this memorandum opinion and order, the motion is denied.

### Facts [1]

Parker was a general population prisoner at Joliet, one of Department's maximum security prisons. On January 6, 1986 Joliet's Assignment Committee [2] approved an "Exception to the Criteria" and reassigned Parker to the Honor Dormitory, which qualified him for a downgrade to medium security status. Parker moved to the Honor Dormitory, where he lived without incident.

About February 6 Parker was removed from the Honor Dormitory, upgraded to maximum security and returned to the general population. Before that transfer he neither received notice of any reassignment hearing nor attended any such hearing. Consequently he alleges that either (1) no hearing occurred or (2) any hearing was defective because he had no opportunity to be heard. Either way, Parker says his due process rights were violated.

Parker grieved his reassignment and received a March 25, 1986 hearing before the Joliet Inquiry Board (the "Inquiry Board"). That hearing resulted in an Inquiry Board finding that Parker was not eligible for the Honor Dormitory for two reasons:

1. He was not scheduled for release until 2000.

2. He had a history of escape from federal custody.

Joliet's Warden James Fairman ("Fairman") concurred with the Inquiry Board's recommendations, so Parker remained in the general population.

On appeal the Administrative Review Board (the "Review Board") [3] also denied Parker's request to return to the Honor Dormitory. They noted both that Parker's release date was too remote for him to qualify for the Honor Dormitory and that he had had two escape attempts: one in 1973 from the United States Marine Corps

---

**1.** Rule 12(b)(6) principles require this Court to accept as true all well-pleaded factual allegations, drawing all reasonable inferences in Parker's favor (*Marmon Group, Inc. v. Rexnord, Inc.,* 822 F.2d 31, 34 (7th Cir.1987) (per curiam)). Factual assertions outside the complaint may not be credited (see, e.g., *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)). Those principles should be familiar territory to any litigator—and that is particularly so as to counsel for Department, whose automatic response to virtually every complaint seems to be a Rule 12(b)(6) dismissal motion. Yet Department's counsel persists in making factual assertions outside the Complaint. It is of course possible to convert a Rule 12(b)(6) motion to one for summary judgment under Rule 56 (Rule 12(b) specifically contemplates that potential, though this Court has often commented on the limited utility of that option in most cases) (see, e.g., *United States ex rel. Adams v. O'Leary,* 659 F.Supp. 736, 739 n. 8 (N.D.Ill.1987)). But here counsel has offered no evidence of the sort contemplated by Rule 56. Rather he has relied on unsworn assertions in legal memoranda. Such disregard for the fundamental principles of Rule 12(b)(6) is really inexcusable (*Car Carriers* did not state new law, and numerous cases since then have echoed the same concept). Parker's counsel, who was appointed by this Court and is receiving no compensation, has been forced to respond to totally inappropriate arguments. This opinion will not mention such arguments further.

**2.** 20 Ill.Admin.Code §§ 420.10–420.40 mandate the creation of an Assignment Committee at each correctional institution to assign inmates to programs and housing and to set security classifications. All further references to Title 20 of the Illinois Administrative Code will simply take the form "Section—," conforming to its internal numbering.

**3.** All three members of the Review Board (Marjorie Donahue, Peggy Helfrich and Lisa Caillouet) are named defendants. Each is sued individually as well as in her official capacity. Because the legal issues governing liability for those three defendants are identical, they will be referred to collectively.

and the other from federal custody in 1974. As for the first of those, Complaint ¶ 21 alleges (and this Court must therefore accept) that Parker was never in the military or in military custody. As for the second, Parker says the Review Board's reliance violated Department's own regulations, which say only escape attempts less than seven years old should be considered.

Department Director Michael Lane ("Lane") concurred in the Inquiry and Review Boards' decisions. Parker remained in the general population until September 1, when he was returned to the Honor Dormitory.[4]

### Defendants' Contentions

Defendants offer three reasons for dismissal of the Complaint:

1. Parker had no right to a pre-transfer hearing because Department rules were followed.

2. Lane's personal involvement is not alleged.[5]

3. Each defendant is entitled to qualified immunity from damages.

Each contention will be discussed in turn.

### Right to Pre–Transfer Hearing

■ To recover under Section 1983, Parker must show someone acting under color of state law deprived him of a protected liberty interest, without his receiving due process of law. At the threshold, then, Parker must establish he had a protected interest in remaining in the Honor Dormitory rather than the general population.[6]

■ Protected liberty interests may derive from the Constitution itself or from a state's statutory or regulatory enactments (e.g., *Hewitt v. Helms*, 459 U.S. 460, 469, 103 S.Ct. 864, 870, 74 L.Ed.2d 675 (1983)). Parker's able appointed counsel do not contend the Constitution gives Parker a liberty interest in being assigned to a par-

ticular part of the prison. His criminal conviction entitled the state to confine him in any of its prisons. So as long as the conditions of his confinement do not violate constitutional norms, Parker has no constitutionally derived liberty interest in a particular assignment as such (*Meachum v. Fano*, 427 U.S. 215, 224–25, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); *Williams v. Faulkner*, 837 F.2d 304, 309 (7th Cir.1988)). If however any state statutory or regulatory enactments sufficiently restrict Department officials' ability to transfer inmates, a liberty interest may nonetheless exist (*Hewitt*, 459 U.S. at 471–72, 103 S.Ct. at 871; *Williams*, 837 F.2d at 309).

Parker points to the Joliet Correctional Center Assignment Committee Manual (the "Manual") as assertedly creating such a liberty interest. That document outlines the procedures the Assignment Committee is to use in assigning security classifications, work and housing to prisoners. It says in part (Manual at 4–5):

> C. The Assignment Committee will make classification changes only after a full committee hearing with the inmate in accordance with D.R. 420.
>
> \* \* \* \* \* \*
>
> J. Inmates will be given 48 hours notice prior to an assignment committee hearing. They may waive this requirement.
>
> K. Inmates will be allowed to present relevant documents, testimony, and information while at the hearing.

■ Defendants limit their response to a claim that the Manual's requirement for a hearing applies *only* to changes in security classifications and not to changes in housing assignments. Thus defendants have not maintained (and Parker has therefore had no occasion to reply to any contentions):

> ants unquestionably acted under color of law, and (based on the Complaint, which this Court must credit) Parker received no process before he was deprived of the asserted liberty interest. Thus, if *any* process were due, Parker has stated a claim.

---

4. Parker has since been moved to Department's East Moline minimum security prison.

5. This ground is of course inapplicable to the other defendants.

6. As the parties correctly perceive, that is the only inquiry relevant to this motion: All defend-

1. that the Manual is not the sort of document that can create a substantive liberty interest;

2. that the language used in the Manual is not mandatory on prison officials; or

3. that the Manual creates procedural safeguards rather than substantive restrictions on prison officials' discretion.

In short, defendants have effectively conceded—by their silence—that the Manual does create a constitutionally protected liberty interest in a prisoner's *security* classification. They simply say the Manual's requirements do not extend to changes in housing assignments.

Defendants are of course free to choose their battle lines. This opinion will therefore assume without deciding that the Manual and related regulations do create at least some type of protected liberty interest and that the only issues are (1) whether the interest Parker asserts is within that protected area and (2) whether defendants' conduct infringed that interest.

Defendants do not explain their contention that the hearing and notice requirements of the Manual apply only to changes in security classifications, apparently in the belief that their reading of the Manual is inescapable. It is not.

Paragraph C requires a hearing before the Assignment Committee changes an inmate's "classification." If that paragraph were to be read in isolation, *and* if "classification" were to refer only to "security classification," defendants' position would have merit. But at this preliminary pleading stage that narrow reading of "classification" surely does not follow as night follows day. Nowhere is the term defined, nor are the Manual and related regulations drafted so as consistently to use "classification" as meaning "security classification." For example, the Manual's Introduction, headed "CLASSIFICATION," says: [7]

IT IS THE POLICY OF THE JOLIET CORRECTIONAL CENTER THAT IN-MATES PARTICIPATE IN THE CLASSIFICATION PROCESS. CLASSIFICATION BEGINS WHEN AN INMATE ENTERS THE RECEPTION AND CLASSIFICATION UNIT. AFTER HE HAS BEEN ASSIGNED PERMANENT PLACEMENT AT THIS INSTITUTION, THE CLASSIFICATION PROCESS CONTINUES WITH PROGRAM AND/OR WORK ASSIGNMENT PLACEMENT. THIS MANUAL IS DESIGNED TO OUTLINE THE CLASSIFICATION PROCEDURE IN THE PROGRAM AND/OR WORK ASSIGNMENT STAGE.

\* \* \* \* \* \*

AN INTEGRAL PART OF THE CLASSIFICATION PROCESS IS CELL PLACEMENT. AT THE JOLIET CORRECTIONAL CENTER RECEPTION AND CLASSIFICATION INMATES ARE HOUSED IN THE ANNEX AND EAST CELLHOUSE. PERMANENT POPULATION INMATES ARE HOUSED IN THE WEST CELLHOUSE AND HONOR DORMITORY. NORTH CELLHOUSE CELLS ARE USED FOR SPECIAL PURPOSES. SHOULD A PERMANENT POPULATION INMATE EXHIBIT EXCEPTIONAL BEHAVIOR, HE MAY REQUEST HOUSING IN THE HONOR DORMITORY. IN THE WEST CELLHOUSE, INMATES ARE CELLED BY ASSIGNMENTS, ACCORDING TO A CELL BLOCKING SYSTEM.

With "cell placement" (specifically including "housing in the Honor Dormitory") specified as "an integral part of the classification process," it is (to say the least) difficult to justify the much more restrictive reading of the term "classification" (when used elsewhere in the same document) in the way proposed by defendants. Indeed, defendants' position is undercut by two aspects of the Manual's section on the Assignment Committee itself:

1. As the Policy statement for creating that Committee is framed, housing

---

7. Because the entire introduction is typed in capital letters in the Manual itself, it has been reproduced that way in the text (although conventional upper and lower case format would certainly make for easier reading).

assignments and security status changes are given equal standing:

> The Assignment Committee shall also be responsible for issuing inmates housing assignments and changing inmates' security status.

It would certainly be a strained construction to read the procedures prescribed for that Committee's actions as applicable to one part of its functions and not the other—absent, of course, a specific statement to that effect.

2. Paragraph C itself calls for Committee hearings to be conducted "in accordance with [Section] 420." That Section creates the same parallel as the Policy statement as to the duties of an Assignment Committee: They are stated as covering "institutional assignments, inter-institutional transfers requested by committed persons and security classifications and program assignments" (Section 420.20).

Defendants have thus failed to demonstrate a reasonable predicate for treating the Assignment Committee's "classification" functions as embracing (1) security status changes but not (2) housing assignment changes that are *based* on inmate "classification changes." And just as Paragraph C mandates "a full committee hearing with the inmate" as a prerequisite to *any* classification change, so Paragraphs J and K give inmates the right to notice of Assignment Committee hearings and the right to present evidence at such hearings. Neither of those rights is limited to only one category of hearings: those called to consider changes to inmates' security classifications.

■ In sum, for purposes of the present motion it must be considered that the Manual's requirement of notice and an opportunity to be heard applies to Assignment Committee hearings where an inmate's placement is changed in a manner that connotes a change in his classification. Because defendants have offered only their contrary (and unsupported) reading of the Manual to defeat Parker's claim, the Complaint states a claim for relief.

### Lane's Personal Involvement

Complaint ¶ 23 alleges Lane concurred with the decisions of the Inquiry and Review Boards and thereby gave those findings Departmental approval. Instead of dealing with that allegation, defendants have chosen to assert Lane's "sole nexus with plaintiff" is that he keeps a master file on all prisoners and is Department's Director. D.R.Mem. 5 then asserts "[p]laintiff cannot allege any other involvement" and therefore the Complaint "is devoid of any allegations of individual wrongdoing" on Lane's part.

■ Litigants may not rewrite an opponent's pleadings and then rebut allegations the opponent has never made. Parker's Complaint may be searched in vain for any mention of a master file of prisoners, or for any indication that Parker seeks to hold Lane liable either for keeping such a file or on a theory of respondeat superior. Whatever the merit of defendants' contentions as an abstract point of law, they have nothing to do with the Complaint. Defendants offer no reason why Lane's approval of the action against Parker is not sufficient personal involvement to hold him liable.

### Qualified Immunity

Defendants' final contention is that they are immune from suit because their conduct did not violate any "clearly established statutory or constitutional rights of which a reasonable person would have known" under the doctrine of *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Parker's counsel responds primarily that qualified immunity is an affirmative defense that must be pleaded and proved, so the issue should not be resolved on a motion to dismiss.

■ As *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815–16, 86 L.Ed.2d 411 (1985) makes clear, qualified immunity encompasses not only immunity from liability but immunity from suit. *Harlow* itself specified the qualified immunity issue should be resolved as early as

**358**

possible—indeed, even before discovery is allowed (457 U.S. at 818). Hence if Parker's pleading of the facts fails to describe a violation of a clearly established right, the Complaint should be dismissed (see *Kennedy v. City of Cleveland,* 797 F.2d 297, 299 (6th Cir.1986)). Even if qualified immunity does not entitle defendants to dismissal now, they may reassert the immunity through properly supported motions for summary judgment and after trial (*id.* at 299–300).

Defendants say that as of early 1986 (and even now for that matter) the law was clearly established that prison officials could transfer a prisoner without a pre-transfer hearing. To the extent defendants mean an inmate enjoyed no constitutionally-derived liberty interest in incarceration in a specific facility, that statement is unimpeachable (e.g., *Meachum,* 427 U.S. at 224–25, 96 S.Ct. at 2538); *Olim v. Wakinekona,* 461 U.S. 238, 244–48, 103 S.Ct. 1741, 1745, 75 L.Ed.2d 813 (1983)). But it was equally well established in early 1986 (as it is now) that it was necessary to look to state law to determine whether a liberty interest existed (*Olim, id.* at 248–51, 103 S.Ct. at 1747–48; *Hewitt,* 459 U.S. at 469–72, 103 S.Ct. at 870–72).

Here Parker has pointed to a state rule, in existence at the time of defendants' actions, that assertedly created the liberty interest at issue here. Defendants' quarrel with that interpretation has already been reviewed at length and found wanting. If defendants have nothing better to refute the common sense reading of the Manual as a whole, as advanced by Parker and adopted by this Court, then the right defendants are alleged to have violated must be viewed as having been clearly established by defendants themselves at the time.

■ That leaves open only the question whether a reasonable official should have known of the right. That is easy. Defendant Fairman promulgated the Manual, which describes Department's assignment and classification procedures. All other defendants are Department officials who ought to be aware of Department's own rules. Defendants are not entitled to dismissal on immunity grounds at this stage.

### Conclusion

Defendants' motion to dismiss the Complaint is denied. They are ordered to file their answer on or before May 31, 1988. This action is set for a status hearing June 7, 1988 at 9 a.m.