Nicki Aaron BONNER, Plaintiff,

v.

ARIZONA DEPARTMENT OF CORRECTIONS, Samuel Lewis; Tim Crowley; Javier Vega and John Does, Defendants.

No. CIV 86–1771 PHX CLH.

United States District Court,
D. Arizona.

May 26, 1989.

Joseph E. Abodeely, Phoenix, Ariz., for plaintiff.

Lynne W. Abney, Asst. Atty. Gen., Phoenix, Ariz., for defendants.

## MEMORANDUM OPINION AND ORDER

HARDY, District Judge.

### BACKGROUND

Bonner is an inmate at the Arizona State Prison. He is deaf, mute, and suffers from a severe progressive vision loss which results in increasingly narrow tunnel vision. Bonner filed suit pro se alleging that the failure of prison officials to provide him with a qualified interpreter constitutes a violation of Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination against otherwise qualified handicapped individuals who wish to participate in programs receiving federal funds.

Bonner claims that his poor reading and writing skills prevent him from communicating his thoughts through writing or understanding others by reading their words via a telecommunications device provided to him by the prison officials. He claims that the inmate interpreters provided to him by the prison officials are unskilled, and that he can only understand them 50% of the time.

He also alleges violations of his constitutional rights to due process, equal protection, and the eighth amendment's prohibition against cruel and unusual punishment. Bonner seeks injunctive relief and damages.

This court dismissed Samuel Lewis, Director of the Arizona Department of Corrections as a defendant and granted summary judgment in favor of the remaining prison officials. Bonner appealed, and the Ninth circuit reversed and remanded on two issues, 857 F.2d 559.

## I. *The Rehabilitation Act Claim*

The Ninth Circuit held that Bonner must establish four elements in order to prove a Section 504 violation:

(1) that, as a deaf, blind, and mute plaintiff, he is a handicapped person under the Rehabilitation Act;

(2) that he is otherwise qualified;

(3) that the relevant program receives federal financial assistance; and

(4) that the defendants' refusal to provide qualified interpreter services impermissibly discriminates against him on the basis of his physical handicaps.

The court noted that while the first two elements were undisputed, the third and fourth elements raise genuine issues of material fact. The Rehabilitation Act claim was remanded to this court to determine whether the prison or its programs receive federal financial assistance.

This court directed the defendants (hereinafter referred to collectively as "the Department") to file an affidavit on the receipt of federal financial assistance and the plaintiffs have filed a response to the Department's affidavit on federal financial as-sistance. This court denied the Department's motion to strike plaintiff's response to the affidavit on federal financial assistance.

In its affidavit, the Department acknowledges receiving federal financial assistance. The Department also stipulates for the first time that "[t]he Arizona Department of Corrections will provide 'appropriate auxiliary aids' to plaintiff for any programs and activities that do receive federal financial assistance. *See* C.F.R. Section 42.503(f) (1988) (appropriate aids may include qualified interpreters and devices such as electronic readers and telephonic transcribers) [Department of Justice regulations implementing Section 504 of the Rehabilitation Act]."

However, the Department argues that the federal financial assistance must have a nexus to the program or activity in which the handicapped individual seeks to participate in order to state a viable claim under Section 504. *See Henning v. Village of Mayfield Village*, 610 F.Supp. 17, 19 (N.D. Ohio 1985). Since Bonner's complaint only seeks the aid of a qualified interpreter for prison counseling sessions, administrative or disciplinary hearings, medical treatments and diagnosis, and none of these programs receives direct federal financial assistance, the Department argues that its receipt of federal aid is unrelated to the programs and activities in Bonner's complaint. Consequently, the Department contends that Bonner does not have a viable claim under Section 504 since there is no nexus or connection between the Department's receipt of federal funds and the programs in which he seeks to participate.

Bonner contends that the recently enacted Civil Rights Restoration Act, which provides that a "program or activity" includes all of the operations of a state department or agency, overruled cases such as *Henning v. Mayfield Village*, and that the Department has effectively conceded its case by admitting that they are obligated to provide Bonner with a qualified interpreter for participation in any of its programs or activities that receive federal financial aid.

## DISCUSSION

Section 504 of the Rehabilitation Act, 29 U.S.C.A. Section 794 (West.Supp.1988), provides:

> No otherwise qualified individual with handicaps in the United States ... shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance....

In *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), the Supreme Court held that Title IX's prohibition against sex discrimination in "any education program or activity receiving federal financial assistance" did not require institution-wide compliance as a condition of receiving federal grant money, but only mandated compliance by the specific program or activity receiving the federal aid in question. In *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984), the Supreme Court held that the Rehabilitation Act's prohibition of discrimination against the handicapped was also limited "to the specific program that receives federal funds." *Id.* at 636, 104 S.Ct. at 1255.

In general, courts have read the legislative history behind the Rehabilitation Act to suggest that Congress intentionally gave broad scope to the term "federal financial assistance" in Section 504. *See Arline v. School Bd. of Nassau County*, 772 F.2d 759 (11th Cir.1985), *aff'd*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). In particular, the Eleventh Circuit has argued that "the legislative history of the 1974 amendments is replete with notations indicating that Section 504 was intended to encompass programs receiving federal financial assistance of any kind." *Jones v. Metropolitan Atlanta Rapid Transit Authority*, 681 F.2d 1376, 1379–80 (11th Cir. 1982). While payments for obligations incurred by the federal government as a market participant do not constitute "federal assistance," *Hingson v. Pacific Southwest Air*, 743 F.2d 1408, 1414 (9th Cir.1984), any payments made by the government without

such a legal obligation would subject a program or employer to the requirements of Section 504. *Arline*, 772 F.2d at 762. In addition, once federal money is deposited into a general fund, all activities paid for out of that fund become subject to Section 504. *Id.* at 763.

■ On March 22, 1988, Congress enacted the Civil Rights Restoration Act of 1987, Pub.L. No. 100–259, 102 Stat. 28 (codified at 29 U.S.C. Section 794(b)(1)(A) (Supp. 1989)). The Restoration Act amended Section 504 of the Rehabilitation Act in part by defining the term "program or activity" as "all the opreations of ... a department, agency, special purpose district, or other instrumentality of a State or of a local government." Under this revised definition of program or activity, the Department's admission that Bonner is entitled to "appropriate auxiliary aids" for any programs and activities that do receive federal financial assistance means that he would be entitled to "appropriate auxiliary aids" for participation in all of the operations of the Department of Corrections regardless of which specific program receives federal funds.

The Department notes that the Civil Rights Restoration Act was passed on March 22, 1988, long after Bonner initiated this suit, and argue that the Act should not be applied retroactively. So far, only one federal district court has examined the question of whether Congress intended the Civil Rights Restoration Act to be applied retroactively to cases that were pending at the time of its passage.

In a well-reasoned opinion, which included an exhaustive review of the legislative history behind the Civil Rights Restoration Act, the District Court for the Eastern District of New York held that the Act should be applied retroactively. *Leake v. Long Island Jewish Medical Center*, 695 F.Supp. 1414 (E.D.N.Y.1988), *aff'd*, 869 F.2d 130 (2nd Cir.1989). Noting that the express purpose of the statute was to "restore the broad scope of the coverage and to clarify the application of ... Section 504 of the Rehabilitation Act of 1973," the *Leake* court concluded that Congress' in-

tention to correct what it believed to be an incorrect judicial interpretation by the Supreme Court in *Darrone* and *Grove City* required a retroactive application of the legislation.

This court adopts the persuasive reasoning of *Leake v. Long Island Jewish Medical Center* and applies the Restoration Act retroactively. Plaintiff's suit under Section 504 should be allowed to go forward.

Since the Civil Rights Restoration Act can be applied retroactively in this case, and the Department has admitted that it receives a significant amount of federal assistance, the Rehabilitation Act's prohibition of discrimination against otherwise qualified handicapped individuals applies to all the programs and activities of the department regardless of which specific program receives federal funds.

The Department now has two choices. It can treat its admission that Bonner is entitled to "appropriate auxiliary aids" for those specific programs that do receive financial aid as a general admission that Bonner is entitled to such aids for all of its programs or activities, in which case summary judgment will be granted in Bonner's favor.[1] The only other alternative is for the Department to stand by their denial that Bonner is unable to effectively communicate his thoughts or understand others through use of either the telecommunications device or prison inmate interpreters provided by the Department. If the Department can establish that Bonner is able to effectively communicate without the use of a qualified interpreter, and that adequate communication is achieved through use of the telecommunications device and inmate interpreters, then no discrimination could have occurred. *See Bonner*, 857 F.2d at 563.

## II. Existence of a Due Process Liberty Interest in the Department's Regulations Governing Placement in Protective Lockdown, and Removal From the Honor Dorm and Disciplinary Procedure

The Ninth Circuit also remanded the issue of whether statutes and regulations governing Bonner's placement in protective lockdown create a liberty interest in remaining within the general prison population, and whether statutes and regulations governing placement in and removal from the honor dorm create a liberty interest. Where a liberty interest is involved, due process requires prison officials to inform the prisoner of the charges against him and permit him to present his views. *Toussaint v. McCarthy*, 801 F.2d 1080, 1100 (9th Cir.1986). If the statutes and regulations governing Bonner's placement in protective lockdown and removal from the honor dorm do create a liberty interest, "a genuine issue of material fact exists regarding whether the denial of a qualified sign language interpreter prevented Bonner from understanding the charges against him or presenting his views." *Bonner*, 857 F.2d at 565. If the statutes and regulations do not create liberty interests, summary judgment in favor of the defendant on this issue is appropriate. *Id.*

In *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court found that a Pennsylvania statute created a liberty interest in remaining within the general prison population through the use of "mandatory language in connection with requiring specific substantive predicates" to the placement of prisoners in administrative detention. However, prison regulations do not create a constitu-

---

[1] As the Department has acknowledged, the United States Department of Justice has promulgated regulations under Section 504 which apply to correctional facilities receiving federal financial assistance. The regulations require those facilities to "... provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where refusal to make such provision would discriminatorily impair or exclude the participation of such persons.... Such auxiliary aids may include brailled and taped materials, *qualified interpreters*, readers, and telephonic devices." 28 C.F.R. Section 42.503(f) (1988) (emphasis added). Plaintiff's amended complaint has specifically identified certain prison programs in which he needs the assistance of a qualified interpreter including, but not limited to, counseling, educational programs, vocational programs, medical care and psychiatric treatment.

tionally protected liberty interest where they leave classification procedures to official discretion. *Baumann v. Arizona Department of Corrections,* 754 F.2d 841, 845 (9th Cir.1985).

The regulations governing the procedural requirements for classification hearings and disciplinary hearings are contained in Arizona Official Compilation, Administrative Rules and Regulations, Title V, "Corrections." The regulations governing *removal* from the honor dorm are governed by Arizona Department of Corrections Post Order No. 500.3, Rule No. 5.3, promulgated under the authority of A.R.S. 31–201.01.

### A. Due Process Liberty Interest in Classification Hearings

A committee within an Arizona prison conducts classification reviews. The regulations require that "[a] classification hearing will be scheduled at six (6) month intervals." Ariz.Admin.Comp. R5–1–207(A)(1). An inmate is entitled to notice to prepare for the hearing. R5–1–207(B). Hearing procedures provide that the "inmate shall be afforded an opportunity to provide the committee with a relevant oral or written statement during the hearing" and that the "inmate will be verbally informed" of the committee's recommendation. R5–1–207C(4) and (5).

However, Ariz.Admin.Comp. R5–1–206, "Initial classification and reclassification overrides," provides: ˙

> The Director, or his designee, may establish ratings that are higher or lower than any rating designated by the initial classification instrument or the reclassification instrument. If, in some circumstances, the Director or his designee determines, in his sole discretion, that adherence to the procedures established by this Chapter may jeopardize the welfare or security of inmates, Department of Corrections staff or the public, he may, in those circumstances, decline to follow those procedures.

R5–1–206 was adopted as a permanent rule effective December 11, 1986, the exact same date that R5–1–207 was adopted as a permanent rule. R5–1–206 can only be interpreted as giving the director sole discretionary power to abandon the procedural requirements outlined in R5–1–207.

### B. Due Process Liberty Interest in Removal from the Honor Dorm

So long as the conditions of his confinement do not violate constitutional norms, Bonner has no constitutionally derived liberty interest in assignment to a particular part of the prison. *Meachum v. Fano,* 427 U.S. 215, 224–25, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). However, a liberty interest may exist if any statutory or regulatory enactment sufficiently restricts prison officials' ability to transfer inmates. *Hewitt,* 459 U.S. at 471–72, 103 S.Ct. at 871. Although not formally promulgated as a regulation, an explicit written policy statement may create a protected interest. *Baumann,* 754 F.2d at 844.

There is no indication that the Department's Post Order governing removal from the honor dorm is governed or controlled by the specific classification procedures found in R5–1–202 to 207. The procedural requirements governing removal from the honor dorm are independent of the classification procedures that would have entitled an inmate to consideration for housing in the honor dorm in the first place. The discretionary language found in R5–1–206 merely permits the director to decline to follow the classification procedure. It does not give him the authority to decline to follow the separate procedure which governs an inmate's removal from the honor dorm. Rule 5.3 of Post Order No. 500.3 lists the reasons for which an inmate can be removed from the honor dorm, which include conviction of major and/or minor disciplinary infractions. Rules 5.3.3 and 5.3.4 state the circumstances under which an inmate "will be seen by the Honor Dorm Review Committee," while Rule 5.3.3.3 provides for an appeal of a decision of the Honor Dorm Review Committee.

■ The Department argues that "[t]he Honor Dorm regulations make it clear that the program is a privilege, and not an entitlement or right. Selection is highly discretionary." While Bonner clearly had

no entitlement to being assigned to the honor dorm in the first place, once the privilege was conferred, the regulations provided him with specific due process rights governing his removal from the honor dorm. While selection to the honor dorm may be "highly discretionary," the regulations expressly provide that removal from the honor dorm is not highly discretionary.

Bonner is correct that Post Order 500.3 constitutes an official policy pronouncement containing substantive standards and criteria that must be met prior to an inmate's removal from the honor dorm. Because the procedural guidelines governing an inmate's removal from the honor dorm "used language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed," the regulations created a constitutionally protected liberty interest. *Hewitt*, 459 U.S. at 471–472, 103 S.Ct. at 871; *see also Baumann v. Arizona Department of Corrections*, 754 F.2d 841 (9th Cir.1985); *Parker v. Lane*, 688 F.Supp. 353 (N.D.Ill.1988) (prison classification regulations using mandatory language established state-created constitutionally protected liberty interest in removal from honor dorm).

### C. Due Process Liberty Interest in Disciplinary Procedure

■ Bonner alleges that the application of the disciplinary hearing procedures without the use of a qualified sign language interpreter infringed upon a protected liberty interest. He alleges that at each of the disciplinary hearings, which resulted in his removal from the honor dorm and in his being found guilty of other infractions, he was not afforded a sign language interpreter and that he was consequently denied his right to due process.

The regulations governing inmate disciplinary hearings are found in Ariz.Admin. Comp. R5–1–601 to 606. R5–1–601 provides in pertinent part that "[t]hroughout the disciplinary process the individual prisoner's basic constitutional rights will be observed and discipline will be accomplished with dignity, reason and humaneness."

The regulations further provide the following specific, mandatory requirements, involving communication with prisoners suspected of disciplinary violations, which must be followed by department staff members and officials:

R5–1–603. Procedures for administration of discipline

B. Formal disposition of violations. Any staff member who observed a violation or is made aware by another staff member of a violation which is serious enough to be handled in a formal manner *will follow* the following procedures:

1. ... The prisoner *will be verbally informed* that he is being reported, unless security considerations dictate otherwise, and within 24 hours of the incident *will be given a written copy* of the alleged rule violation(s). If an investigation is necessary to determine either the identity of the alleged violator or the extent of his involvement in the incident, the prisoner *will be given written notice* of the alleged violations within 24 hours after the investigation is completed.

Ariz.Admin.Comp. R5–1–603 (emphasis added).

This is only one example of the mandatory nature of procedural rules governing the administration of discipline. The regulations are replete with requirements that "the decision *must* be reviewed;" or that "[t]he Coordinator of Discipline *will then discuss the case* with the offending prisoner;" or that "the Coordinator of Discipline *will interview* the offending prisoner;" or that "inmates charged with minor rules violations are *entitled to a hearing* within seven working days."

To the extent that their application resulted in Bonner's removal from the honor dorm, the unmistakably mandatory character of the language of the regulations creates a constitutionally protected due process liberty interest under the Supreme Court's holding in *Hewitt*.

To require a deaf, mute, and vision-impaired inmate to navigate through this legal miasma without a qualified interpreter

certainly would not comport with the department's stated goal of accomplishing discipline "with dignity, reason and humaneness." Ariz.Admin.Comp. R5–1–601.

### ORDERS

IT IS ORDERED granting the defendants' motion for summary judgment on Bonner's claim that he has a constitutionally protected due process liberty interest in remaining in the general prison population by avoiding protective lockdown.

IT IS FURTHER ORDERED denying defendants' motion for summary judgment on Bonner's claim that he has a protected liberty interest in remaining in the honor dorm, and that he has a due process liberty interest in the presence of a qualified sign language interpreter at all stages in the prison's disciplinary procedure.

IT IS FURTHER ORDERED denying the defendants' motion for summary judgment on Bonner's Rehabilitation Act claim.