**Sharon JOHNSON, Ph.D.**

v.

**Dr. Louis W. SULLIVAN.**

Civ. No. HM–89–2999.

United States District Court,
D. Maryland.

Nov. 13, 1991.

Debra Katz, Bernabei & Katz, Washington, DC, for plaintiff.

Jamie M. Bennett, Baltimore, MD, Eileen M.I. Houghton, Washington, DC, for defendant.

## MEMORANDUM

HERBERT F. MURRAY, Senior District Judge.

Plaintiff, Dr. Sharon Johnson, brought this action alleging sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and handicap discrimination under the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq. On February 8, 1991, this Court denied the motions for summary judgment filed by both sides. However, the Court did find that plaintiff had shown that she was an "otherwise qualified individual with handicaps" under the Rehabilitation Act. (Court's Memorandum and Order of February 8, 1991, at 28). The Court conducted a bench trial beginning on June 24, 1991, and ending on July 3, 1991. The Court has considered all the testimony, the depositions and other evidence admitted at trial, and the proposed findings of fact and conclusions of law submitted by the parties after trial, and is now prepared to rule.[1]

1. Plaintiff has filed a motion to strike certain portions of defendant's proposed findings of fact,

## I. FINDINGS OF FACT

(1) Dr. Sharon Johnson holds a Ph.D. in biochemistry from the Massachusetts Institute of Technology. Prior to coming to work at the National Institutes of Health ("NIH"), Dr. Johnson held the positions of Associate Research Professor of Chemistry, Polytechnic Institute of New York; Assistant Professor of Biochemistry, University of Pittsburgh; Senior Chemist, Westinghouse Research and Development Laboratories; Associate Professor of Chemistry, Vassar College; and Research Fellow in Fundamental Research, Carnegie Mellon Institute.

(2) On September 9, 1979, Dr. Johnson began to work for the National Institute of Health ("NIH") in the Grants Associate Program, a one-year training program. After the training, she worked in the National Institute of Dental Research until July, 1984. In July, 1984, Dr. Johnson began work in the Division of Research Grants ("DRG") of NIH.

(3) Dr. Johnson states that Dr. Asher Hyatt, her supervisor, kissed her on her first day of work and sexually harassed her throughout her employment. She states that he called her "Luv" and other diminutive names, touched her shoulders and back on several occasions, embraced her on one occasion, and asked her to have lunch with him or meet him for drinks on several occasions. Dr. Hyatt admits to calling her "Luv." He also admits that this was a term of "affection" that he used only with women and children. He further admits to touching her shoulders on occasion, but never kissing or embracing her. Ms. Billie Mackey, an employee at NIH and president of a women's group at NIH, testified that Dr. Johnson spoke with her and to the women's group "SHER" about sexual harassment from her supervisor. Dr. Johnson was embarrassed to talk about the harassment and did not give details to Ms. Mackey or the group.

(4) Plaintiff, Dr. Sharon Johnson, suffers from idiopathic CNS hypersomnolence, which is a form of excessive sleepiness or narcolepsy requiring her to sleep nine or more hours in a day. She has had this condition since her teens. Dr. Johnson also has cardiac arrhythmia, a condition of the heart which causes atrial fibrillation, a rapid, erratic heartbeat which can lead to cardiac arrest or strokes. This heart condition prevents Dr. Johnson from being able to take stimulants which are normally prescribed for narcolepsy. Dr. Johnson's narcolepsy and cardiac arrhythmia are aggravated by stress. In addition, Dr. Johnson has had surgery for breast cancer and requires periodic checkups to monitor any recurrence. This Court has previously ruled that Dr. Johnson's conditions render her "handicapped" within the meaning of the Rehabilitation Act. Moreover, based on her satisfactory performance at NIH over a number of years, this Court found that Dr. Johnson was an "otherwise qualified handicapped individual" within the meaning of the Rehabilitation Act.

(5) In 1982, Dr. Johnson's husband relocated to the Baltimore office of the Westinghouse Corporation. At that time, they moved to Annapolis which was approximately equidistant between Dr. Johnson's workplace at NIH, in Bethesda, Maryland, and her husband's job in Baltimore. Since the move to Annapolis, Dr. Johnson commuted by car to NIH, approximately one hour drive each way. Because of her narcolepsy, at times she became too sleepy to drive. Apparently Dr. Johnson has some warning before she falls asleep, and is able to pull off the road and nap if needed. Because of her sleep disorder, Dr. Johnson had difficulty coming into work at the same time each day and requested some accommodation.

(6) Prior to working in DRG, Dr. Johnson had never found it necessary to ask for accommodation of her handicaps because her previous supervisors allowed her the flexibility she needed with regard to her work hours and leave for medical appointments. In her previous jobs, Dr. Johnson commuted similar distances to work.

(7) At NIH, Dr. Johnson held the GS–14 position of Executive Secretary of the Pathobiochemistry Study Section, which is a group of scientists who review biomedical research

arguing that the evidence did not support the proposed facts. The Court can decide the facts from its recollection of the trial and will accordingly deny the motion.

grant applications to determine which applicants should receive NIH grants. As Executive Secretary, Dr. Johnson was required to attend the meetings of the Study Section, take minutes of the meetings, and write reports which summarize the Study Section's discussion on each grant application. She was also responsible for conducting site reviews of the applicants, processing appeals of grant denials, and selecting members of the Study Section. Dr. Asher Hyatt, Chief of the Biomedical Sciences Review Section, was Dr. Johnson's supervisor. Dr. Johnson's position required her to attend various meetings, all of which were held in locations other than the Westwood Building where she worked. These meetings were often all-day meetings that would continue past the end of the normal workday.

(8) Dr. Johnson spoke with Dr. Hyatt about accommodation for her handicap. Dr. Hyatt asked her to put such a request in writing. On August 22, 1985, Dr. Johnson, in a memorandum to Dr. Hyatt, requested flexible starting and ending times so that she could pull over to nap if she became sleepy while driving. She also asked that she be allowed to change her regularly scheduled working hours at times other than on the officially permitted dates of July 1 and December 1 "so as to take advantage of seasonal traffic patterns and minimize total work hours."

(9) On August 27, 1985, in a reply memorandum, Dr. Hyatt stated that he had "consulted with the DRG Personnel Office" and learned that "[a]ccommodation consideration for your handicap condition requires that you provide appropriate medical supporting documentation." He asked that Dr. Johnson's physician submit documentation that addressed several specific questions. The memo went on to say:

Also note that the medical supporting information may be used as documentation in a disability retirement action. Disability retirement may be *offered* if accommodation cannot be reached.

Plaintiff's Ex. 26 (emphasis in original).

(10) On September 6, 1985, Dr. Johnson sent a memorandum to Dr. Hyatt in which she indicated surprise that such extensive documentation would be needed. On October 1, 1985, Dr. Johnson sent Dr. Hyatt a memorandum describing her handicaps and attached a letter from her physician, Dr. Goldstein, describing her narcolepsy, heart condition, and breast cancer. Dr. Goldstein made the following recommendations:

[S]he will need to have a flexible working hour schedule with due regard given to possible late arrival and late departure. Fortunately her condition is such that she can predict when attacks are about to occur and she is able to take short naps to regain a normal state of consciousness. She is never expected to obtain full or partial recovery and will always be hampered by this condition. If the patient were given a regular work schedule wherein she could participate in a car pool arrangement where she would not be responsible for driving to and from work the above recommendations would not be necessary. However, I understand that she needs to work late at times to attend meetings associated with her current job situation.

Plaintiff's Ex. 29. Dr. Johnson sent copies of her memorandum and Dr. Goldstein's letter to Dr. Friedman and DRG personnel officers.

(11) Dr. Friedman, Chief of the Referral and Review Branch and Dr. Johnson's second level supervisor, reviewed Dr. Johnson's request and informed Dr. Hyatt that DRG policy permitted Dr. Hyatt to grant 15 minutes of flexibility in start and stop time, but that flexitime greater than 15 minutes had to be approved by Dr. Friedman. However, neither Dr. Hyatt nor Dr. Friedman informed Dr. Johnson that 15 minutes flexibility was permitted. Both Dr. Hyatt and Dr. Friedman acknowledged during the trial that they never considered granting plaintiff flexible starting and ending times in excess of 15 minutes because it was not DRG policy.

(12) Between April and August, 1985, Dr. Johnson had several conversations with Mr. Kevin Murphy, a personnel management specialist at NIH at the time. Dr. Johnson wanted information regarding reasonable accommodation of her handicap and was referred to Mr. Murphy by Ms. Carol Storm.

Mr. Murphy met with Dr. Hyatt in April and in August of 1985 to discuss reasonable accommodation and disability retirement for Dr. Johnson. Mr. Murphy specifically told Dr. Hyatt that as the supervisor, it was Dr. Hyatt's responsibility to accommodate Dr. Johnson. In addition, Mr. Murphy spoke with Mr. Pike and Dr. Friedman regarding Dr. Johnson.

(13) On October 7, 1985, Dr. John D. Robertson, the Personnel Officer, sent plaintiff's request for accommodation and documentation to the Assistant Director of the Occupational Medical Services ("OMS") at NIH. In his cover memorandum, Dr. Robertson noted that the plaintiff was being permitted to change her tour of duty four times a year rather than the normal twice a year. On October 30, 1985, plaintiff sent a memorandum to Dr. Hyatt, in which she advised him that Dr. Robertson had given her a copy of his memo to OMS. She indicated that being able to change her hours four times a year was helpful but that she disagreed with Dr. Robertson's perception that she rarely scheduled meetings outside of her regular hours. She stated that having a car pool would only be "partially satisfactory for a person with my responsibility as I go directly to other locations in order to perform my duties as an executive secretary."

(14) The OMS assigned the evaluation of plaintiff's request to Dr. Thomas Lawford, an OMS physician working under the supervision of Dr. Wasserman. Dr. Lawford spoke with Dr. Johnson and her physician. On November 29, 1985, he wrote a report concurring with plaintiff's physician that plaintiff suffered from a form of narcolepsy. He noted that her "condition causes her to fall asleep while driving," and that she has to pull over and sleep for about 15 minutes, often more than once during her hour long drive from Annapolis. Dr. Lawford recommended that Dr. Johnson either be given flexibility in her arrival and departure times at work, or her hours be regularized so that she could join a car pool.

(15) On December 12, 1985, Dr. Robertson provided a copy of Dr. Lawford's recommendations to Dr. Hyatt. On December 13, 1985, Dr. Hyatt sent the plaintiff a note

saying: "The only further accommodation I can make is to the hours of a car-pool. I strongly suggest you try to find an appropriate car-pool. There is a locator in Bldg. 31 (496–6851)." (Ex. 35). Dr. Hyatt admitted that to his knowledge no one in DRG adjusted plaintiff's work hours to make them regular to facilitate her participation in a carpool.

(16) Dr. Johnson joined a car pool soon after she received Dr. Hyatt's memorandum. However, this arrangement was unsatisfactory. She had to drive 25 to 30 minutes to meet the car pool members and then they would take turns driving. Thus, on the days on which it was her turn to drive, her commute was even longer than before joining the car pool. Moreover, because her working hours had not been regularized, on some days she was unable to participate in the car pool. Plaintiff continued to car pool until she left her position.

(17) In December, 1985, Dr. Johnson called Dr. Martha Bryan, an NIH handicap program manager, to ask for information on a reasonable accommodation. Dr. Bryan informed Dr. Johnson that apart from counseling, she could provide no assistance in this regard.

(18) In February, 1986, Dr. Johnson had a three-day Study Section meeting in a hotel in Bethesda. Dr. Johnson requested that Dr. Hyatt allow her to stay in the hotel for two nights at government expense, in order to avoid commuting after the long meetings. Dr. Hyatt refused this request.

(19) During the Winter of 1985 and Spring of 1986, Dr. Johnson was experiencing a great deal of stress at work, partly because of a somewhat increased workload and partly due to the difficulty she was having in getting accommodation for her handicap.

(20) On April 7, 1986, Dr. Johnson requested five weeks of Leave Without Pay ("LWOP") beginning April 9, 1986. In support of her request, she attached a letter from her clinical psychologist, who stated that she had advised Dr. Johnson to take at least a month's leave from work as she was suffering from "extreme physical and psychological exhaustion." (Paper No. 51, Ex. 1, attached Ex. 15). The psychologist ex-

plained that "extremely long commuting time because of her motor pool participation, and increased workload and other demands are causing her stress level to become a matter of concern." *Id.* Dr. Thomas Goldman, testifying at trial as an expert in psychiatry, stated that he evaluated Dr. Johnson in the Spring of 1986, and found her to be "anxious," "overwrought," and "depressive." Dr. Goldman stated that in his opinion, the conditions in her workplace were causing Dr. Johnson to experience a severe stress reaction which was aggravating her narcolepsy and cardiac arrhythmia.

(21) On April 8, 1986, Dr. Friedman approved the leave on the condition that it would not begin until Dr. Johnson gave written assurance to her supervisor that *"everything* needed to complete the summary statements for the last study section round has been completed" and provided a "report of the status of applications pending review of the next round." (Paper No. 51, Ex. 1, attached Ex. 16).

(22) On April 11, 1986, Dr. Johnson requested 52 hours of advance sick leave for routine medical examinations. Dr. Hyatt approved 29 hours of the leave, which he claimed was the amount of sick leave that Dr. Johnson had already used up. Dr. Hyatt also directed, through a memorandum, that any additional sick leave had to be requested and approved in advance in writing. Dr. Johnson received this memorandum no earlier than April 16, 1986. On April 14 and April 15, 1986, Dr. Johnson attended a professional conference in New York. When Dr. Johnson submitted a slip requesting administrative leave for the two-day conference, Dr. Hyatt denied the request stating that prior approval had not been obtained.

(23) On April 16, 1986, Dr. Johnson spent two hours in the morning at a hospital for an evaluation related to her breast cancer. When she returned to work, she submitted a slip for two hours of sick leave. Dr. Hyatt denied this request on the ground that it had not been approved in advance. Dr. Hyatt testified that it was customary policy in DRG to approve small amounts of leave after the leave was taken.

(24) On April 17, 1986, Dr. Hyatt sent a memorandum to Dr. Johnson which stated that Dr. Johnson would be granted no further sick leave until her sick leave balance reached zero, and that no leave of any kind would be granted unless leave was sought in writing three days in advance. Dr. Hyatt testified that he has not placed such restrictions on leave on any other employee.

(25) On April 17, 1986, Dr. Johnson completed a handwritten memorandum to Dr. Friedman, describing the status of her work. On April 18, 1986, Dr. Johnson tried to give the memorandum to Dr. Friedman. Dr. Friedman said he would not accept a handwritten memorandum and handed Dr. Johnson a memorandum, dated April 17, 1986, in which he demanded to know why he had not received the status memorandum. On April 18, 1986, later in the day, Dr. Johnson provided Dr. Friedman with a typed copy of her status memorandum. Dr. Hyatt reviewed the status memorandum and confirmed to Dr. Friedman that Dr. Johnson's work was "essentially complete." Dr. Johnson was apparently still not released on Leave Without Pay.

(26) On April 21, 1986, Dr. Johnson provided Mr. Pike and her supervisors with a letter from Dr. Thomas Goldman, who had interviewed Dr. Johnson the previous day and confirmed that Dr. Johnson was suffering from stress and required a leave of absence. On the same day, at Dr. Johnson's request, her attorney, Mr. Gary Simpson, called Mr. Pike to ask that LWOP be granted. On the same day, April 21, 1986, Dr. Johnson filed an EEO complaint, alleging that DRG had failed to accommodate her handicap, refused to grant her LWOP, and discriminated against her on the basis of her sex and handicap. Later that day, after talking with Dr. Johnson and her attorney, Mr. Pike granted Dr. Johnson LWOP starting on April 22, 1986.

(27) On May 16, 1986, Dr. John Robertson, DRG Personnel Officer, wrote to Dr. Wasserman, OMS's Medical Director, asking her to determine whether OMS would support disability retirement for Dr. Johnson. On June 2, 1986, Mr. Robertson, Dr. Wasserman, Mr. Pike, Dr. Jerome Green, Mr. Mur-

phy, DRG Personnel Specialist, and Dr. Molly Strauss, an OMS psychiatrist, met to discuss Dr. Johnson's leave status and the possibility of disability retirement.

(28) On June 4, 1986, Dr. Johnson submitted an application for disability retirement to the DRG personnel office. According to Dr. Johnson, Mr. Simpson, her attorney at the time, and Dr. Goldman, a psychiatrist who evaluated her, Dr. Johnson was not sure what she should do with regard to her employment at NIH. She wanted to continue to work, preferably under a different supervisor. However, given the difficulty she was experiencing in obtaining accommodation for her handicap and the resulting stressful environment at work, Dr. Johnson felt that disability retirement was her only available option.

(29) On June 5, 1986, Dr. Hyatt drafted an evaluation of Dr. Johnson, backdated to April 1, 1986, which stated that her performance was unsatisfactory. Dr. Hyatt admitted that this review was not a true judgment of her performance but was intended to enable her to receive disability retirement. Dr. Hyatt cut out Dr. Johnson's signature from a previous progress review and affixed it to this false evaluation. He testified that he did not ask her to sign this evaluation because he knew she would refuse. Dr. Hyatt states that he made this false evaluation at the request of Mr. Simpson, Dr. Johnson's attorney, to facilitate disability retirement. However, Dr. Hyatt never met with Mr. Simpson, and Mr. Simpson denied any discussion with anyone regarding a false negative appraisal. Moreover, Mr. Pike stated that he had no discussion with Mr. Simpson or anyone else regarding performance appraisals for Dr. Johnson.

(30) On June 6, 1986, Mr. Pike wrote a letter to Mr. Simpson stating that "it will be necessary for Dr. Johnson to be evaluated by [OMS's] Medical Director and/or psychiatrist prior to her return to duty." (Pltf's Ex. 69). At trial, Mr. Pike stated that the letter did not set forth a "strict requirement" that Dr. Johnson be examined. However, during his deposition, Mr. Pike indicated that compliance was required. Dr. Johnson found out from the Office of Personnel Management

that such an order may be illegal. Furthermore, Dr. Johnson wrote to Congressman Barnes to obtain further information, and received a response that such an examination could not be required.

(31) Because she says she feared loss of her job, Dr. Johnson went for two psychiatric evaluations conducted by Dr. Molly Strauss, an OMS physician, on July 17 and July 24, 1986. Dr. Strauss testified at trial that Dr. Johnson told her that she objected to this examination. During these evaluations, Dr. Johnson was informed for the first time of Dr. Hyatt's unsatisfactory reviews of her performance. Dr. Strauss read parts of the review to Dr. Johnson. Dr. Strauss testified that she, Dr. Strauss, was not aware that the appraisal was not done in the normal course of business. Not knowing that the evaluation was false, Dr. Johnson was extremely distressed to learn about such a negative appraisal from her supervisor. Dr. Strauss testified that Dr. Johnson wanted to keep working. However, Dr. Strauss did not attempt to have Dr. Johnson assigned to a new position.

(32) On August 5, 1986, Dr. Johnson met with Dr. Jerome Green, director of DRG, to discuss the possibility of reassignment to another position not under Dr. Hyatt's supervision. Dr. Johnson states that Dr. Green insisted that retirement was the only option. At trial, Dr. Green testified that he was surprised at Dr. Johnson's request for reassignment since she had already applied for disability retirement. He admitted that he considered no specific alternative positions for Dr. Johnson in DRG.

(33) Defendant states that on August 5, 1986, Mr. Hadley, a DRG personnel manager, certified that plaintiff had been contacted and was unwilling to accept a position at a lower grade, GS–13, at her present salary. Plaintiff says she was not offered the same salary. She says that she told Mr. Hadley that she would prefer a job at her current level, GS–14. In any event, this Court finds that aside from this one possible reassignment, no effort was made by anyone in NIH to assign Dr. Johnson to another position. All the witnesses who testified regarding the possibility of reassigning plaintiff stated that

to their knowledge, no steps were taken to find another position for plaintiff.

(34) On August 20, 1986, Dr. Johnson submitted her resignation, in which she wrote:

For health and personal reasons. Have filed OPM retirement form 150 June 4, 1986. Existing medical conditions exacerbated by job stress related to:

(1) Refusal of supervisor to reasonably accommodate a medically documented handicap.

(2) Personally directed threats and verbal abuse; harassment on medical leave.

(3) Frequent, abrupt, and erratic changes in instruction and policy interpretation from supervisor, leading to stressful and confusing situations. Supervisor frequently has no memory of previous instructions.

(4) Supervisor attempted to limit job-related personal contacts by requiring his clearance on contacts with other professionals and with the Personnel Office, leading to stressful working conditions.

Paper No. 53, Ex. 77. Later that same day, plaintiff sent a letter in which she stated:

Enclosed is a revised resignation action on Form 50. Please substitute this for the longer version I very recently sent. Also enclosed is a resignation letter.

Paper No. 53, Ex. 79. The revised version of the form stated:

For health and personal reasons relating to job stress which exacerbated existing medical condition. Have filed OPM Form 1503 for retirement.

Paper No. 53, Ex. 80.

(35) On April 14, 1987, plaintiff was notified by OPM that her application for disability benefits had been denied. Plaintiff filed a request for reconsideration, and through her attorney, requested DRG officials to supply further documentation in support of her application for disability retirement. Dr. Hyatt and Mr. Hadley provided further statements. Subsequently, on February 3, 1988, OPM reconsidered its previous decision and granted plaintiff retirement benefits retroactive to April 22, 1986.

(36) After her separation from NIH, Dr. Johnson attempted to find new employment, but was unable to secure full time employment until April 9, 1990. Before that time, she held the following part-time positions: a research scientist at the Johns Hopkins Medical School, a chemist for Anne Arundel County, and consultant for the Eastern Research Group. On April 9, 1990, Dr. Johnson assumed the position of Executive Secretary at the Food and Drug Administration. She remained at that position until she resigned to purchase a flower shop.

## II. CONCLUSIONS OF LAW

### A. Handicap Discrimination Claim

The Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., ("the Act"), provides a comprehensive scheme to combat all forms of discrimination against the handicapped. *Allen v. Heckler,* 780 F.2d 64, 67 (D.C.Cir.1985). Section 504 or Title V of the Rehabilitation Act provides, in relevant part:

No otherwise qualified individual with handicaps in the United States ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794. In particular, the Act prohibits employers from discriminating against otherwise qualified individuals with handicaps. Federal agencies, such as the Department of Health and Human Services, have responsibilities beyond the non-discrimination requirements of Section 504; under Section 501 of the Act, federal agencies must undertake affirmative action on behalf of the handicapped. 29 U.S.C. § 791(b). Section 501 requires each department or agency of the executive branch to submit to the Equal Employment Opportunity Commission and the Interagency Committee on Handicapped Employees "an affirmative action plan for the hiring, placement, and advancement of individuals with handicaps." *Id.* Moreover, "[s]uch plan will include a description of the extent to which and methods whereby the

special needs of the employees with handicaps are being met." *Id.*

In a Rehabilitation Act claim, the plaintiff must prove that she is "handicapped" within the meaning of the Act, that she was otherwise qualified for the job in question, and was discriminated against because of her handicap by an employer who receives federal funding. 29 U.S.C. § 794. The Act defines "individual with handicaps" [2] as:

[A]ny person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities,[3] (ii) has a record of such impairment; or (iii) is regarded as having such an impairment.

29 U.S.C. § 706(8)(B). This Court has previously ruled that the combination of plaintiff's illnesses render her "an individual with handicaps" under the Rehabilitation Act. (Court's Memorandum and Order of February 8, 1991, p. 28).

■ Plaintiff must also show that she is "otherwise qualified" [4] for the job in question, by establishing that in spite of her handicap, she was qualified for the job or would be qualified for the job with or without reasonable accommodation. *Southeastern Community College v. Davis,* 442 U.S. 397, 403–07, 99 S.Ct. 2361, 2365–67, 60 L.Ed.2d 980 (1979). Based on plaintiff's performance reviews of "fully satisfactory" up to April 1, 1986, this Court previously ruled that plaintiff has shown that she was an "otherwise qualified individual with handicaps" under the Rehabilitation Act. The evidence presented at trial was consistent with the Court's earlier ruling.

■ A federal employer has an obligation to provide reasonable accommodation for the handicapped, as long as the accommodation would not impose "undue hardship" on the employer. *Carter v. Bennett,* 651

F.Supp. 1299, 1300 (D.D.C.1987); *aff'd,* 840 F.2d 63 (D.C.Cir.1988); *Prewitt v. United States Postal Service,* 662 F.2d 292, 308 (5th Cir.1981); 29 C.F.R. § 1613.704. The employer bears the burden of persuading the Court that it provided reasonable accommodation or that it was unable to accommodate plaintiff. *Carter,* 651 F.Supp. at 1300. However, once the employer puts forth credible evidence of reasonable accommodation or inability to accommodate, plaintiff has the burden of providing evidence regarding possible accommodation to rebut the employer's evidence. *Id.*

■ Thus, the issue for determination is whether defendant provided "reasonable accommodation" for plaintiff's handicap. Plaintiff sought, verbally and through a formal written request, the accommodation of thirty minutes of flexibility with regard to starting and ending times at work, plus the opportunity to change her tour of duty more frequently. By "thirty minutes of flexibility" plaintiff meant that if her tour of duty was, for example, 8:00 a.m. to 4:00 p.m., then plaintiff could arrive as late as 8:30 a.m. and still be considered on time. She could make up for arriving later by leaving later. At trial, defense counsel tried to argue that plaintiff already had thirty minutes of flexibility because she could come in fifteen minutes early or fifteen minutes late and still be considered on time, allowing a thirty minute span of time within which she could arrive. However, the Court finds this argument totally unconvincing, particularly because plaintiff's supervisors testified that they understood the request to mean that plaintiff could come in thirty minutes before or after her official starting time. Moreover, although it was apparently permissible for an NIH supervisor to allow fifteen minutes of flexibility, there is no indication in the record

---

2. Previously, the term used was "handicapped individual."

3. The Department of Labor regulations explain that "life activities" may be considered to include, among other activities, vocational training, employment, transportation. 41 C.F.R. § 60.741, appendix A (1987).

4. The EEOC regulations state that:

"Qualified handicapped person" means with respect to employment, a handicapped person who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others . . .

29 C.F.R. § 1613.702(f).

that plaintiff was even told that she had fifteen minutes of flexibility.

Plaintiff, Dr. Sharon Johnson, tried to obtain this flexibility through various avenues. She spoke to her supervisors, people in the personnel department, the NIH handicap services coordinator, all to no avail. The only "accommodation" she was provided was Dr. Hyatt's direction that she join a car pool. Certainly, Dr. Johnson was always free to join a car pool; Dr. Johnson's joining a car pool can hardly be considered an accommodation by her employer. Moreover, plaintiff's work hours were not sufficiently regularized so that she could regularly participate in the car pool. She often had meetings that ran later than regular hours, so that she had to drive herself to work.

The Fourth Circuit has stated that the Office of Personnel Management's directives provide important guidance for a court's consideration of whether a federal agency has reasonably accommodated an employee. *Rodgers v. Lehman*, 869 F.2d 253, 258–59 (4th Cir.1989). The "Handbook on Reasonable Accommodation," published by the United States Office of Personnel Management, provides:

> Regulations require agencies to make reasonable accommodation unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of the program.

Pltf.'s Ex. 1, p. 3. Factors listed in determining "undue hardship" include the cost of the accommodation and adverse effect on the program. However, the manual states that "all alternatives should be explored." *Id.* The manual specifically lists "Adjusting Work Schedules" as a type of reasonable accommodation, explaining as follows:

> Some handicapped individuals in our society possess great productive potential which goes unused because they cannot meet the requirements of a standard 40-hour work week. By taking advantage of the flexibilities of alternative work schedules, accommodation can be made for various disabilities. Flexible or altered work schedules may be needed to accommodate disabled workers. Mobility impaired employees who find it difficult to maneuver

during peak periods on public transportation systems *might start their working day a little earlier or later. Workers requiring medical treatment may need a flexible schedule one or two days a week.* Persons who need rest periods could adjust their schedules to make up the time at the beginning or end of the workday. Sometimes employees, because of particular disabilities such as diabetes and epilepsy, should work a regular schedule even though others holding comparable jobs are required to work differing shifts. *This is especially true if the disability is affected by a person's eating or sleeping schedule.*

*Id.,* at 6 (emphasis added). Thus, according to OPM, flexible working hours may be needed to accommodate a handicapped worker. Moreover, the manual suggests the very types of accommodations that plaintiff may have benefited from: flexible starting or ending hours, regularizing of work hours that are otherwise variable, rest periods during the day, and flexibility in order to receive medical treatment.

The National Institutes of Health's personnel manual also has provisions on reasonable accommodation and adopts OPM's definition of reasonable accommodation. The NIH manual encourages the approval of "flexible or altered work schedules as needed to accommodate disabled employees." Pltf's Exh. 2. Under a section entitled "Adjusting Work Schedules," the manual further provides:

> Employees who cannot meet the requirements of the regularly scheduled tour of duty for their position for reasons associated with their disability *(examples include requirement for medical treatment, need for rest periods, or difficulty getting to work)*, should be granted flexible working hours or rest periods if such accommodation can be made without disruption or hardship to the organization.

*Id.* (Emphasis added).

Both Dr. Hyatt and Dr. Friedman testified that at the time Dr. Johnson was employed at DRG they had not read the OPM or NIH manual on handicap accommodation. Although plaintiff stated in her written request that she was seeking accommodation for her

handicaps, her supervisors did not consider the request to be accommodation for an individual with handicaps. Both Dr. Hyatt and Dr. Friedman testified that they believed that they had no authority to grant any further flexibility to Dr. Johnson. Dr. Hyatt admitted that had he read the manual, he would have acted differently towards plaintiff's requests. Dr. Hyatt admitted that allowing Dr. Johnson thirty minutes of flexibility in starting and ending times would not have interfered with her duties at DRG. He stated that his personal opinion was that fixed starting and stopping times were unnecessary; however, as a manager, he had to follow DRG's "irrational" policy. Thus, clearly there was no hardship to defendant in allowing plaintiff the flexibility she requested.[5]

After hearing all the testimony in this case and examining all the evidence, this Court is convinced that plaintiff was not provided with reasonable accommodation. Dr. Johnson only asked for a small amount of flexibility in her arrival and departure times. She testified that had she been able to open a dialogue with her superiors regarding reasonable accommodation, she might have asked for further accommodation, such as brief rest or nap periods during the day. Dr. Johnson explored all possible avenues for obtaining accommodation, speaking to numerous people at NIH, many of whom testified at trial. It is most unfortunate that no one took action to accommodate her.

Defendant argues that Dr. Johnson's problem was that she commuted a long distance, and that defendant had no responsibility to accommodate for this. This Court must disagree. While it is true that some of Dr. Johnson's difficulty from her narcolepsy and other handicaps may have been alleviated if she did not drive to work, the employee in this case was neither commuting an inordinately long distance, nor requesting any extraordinarily burdensome accommodation.[6] Defendant also argues that allowing plaintiff

to change her tour of duty four times a year rather than two was an accommodation. The Court agrees that it was an accommodation, but it was insufficient to meet plaintiff's needs.

■ Furthermore, the Court finds that plaintiff was not provided with reasonable accommodation with regard to her requests for leave to attend to medical problems. There is evidence that whereas it was common practice at DRG to allow employees to obtain approval for leave after it was taken, plaintiff was not allowed to do so on several occasions. Moreover, because Dr. Johnson had special medical needs, her employer should have provided her with more flexibility than other employees as a reasonable accommodation for her handicaps. Certainly the employer has the right to ensure that all necessary work will be completed. However, even within these parameters, the Court feels that more sensitivity and flexibility was due to Dr. Johnson with regard to her requests for leave. As for plaintiff's contention that she was forced to submit to a psychiatric evaluation, the Court finds that there was some degree of coercion in the "request" that she be evaluated at OMS. If NIH did not intend that the evaluation be required, they could certainly have told her that she need not attend if she did not want to. In any event, because there is more than sufficient other evidence that NIH did not reasonably accommodate plaintiff, the Court need not make a finding as to whether NIH's actions with regard to the psychiatric evaluation were illegal. Based on all the information before the Court, the Court concludes that NIH violated the Rehabilitation Act by failing to reasonably accommodate plaintiff.

■ Plaintiff claims that she was constructively discharged from her employment at NIH. The Court of Appeals for the Fourth Circuit has ruled:

A constructive discharge occurs when "an employer deliberately makes an employee's working conditions intolerable and

---

5. Moreover, starting in October, 1987, NIH allowed all employees thirty minutes of "flexitime" in arriving and departing from work. Thus, clearly such an accommodation was not a hardship to defendant.

6. Moreover, the Court is cognizant, as employers should be, that sometimes, as in this instance, family considerations may require employees to commute some distance to work.

thereby forces him to quit his job." *Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir.1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985) [citations omitted]. A plaintiff alleging constructive discharge must therefore prove two elements: deliberateness of the employer's action, and intolerability of the working conditions.

*Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied, Bristow v. Daily Press, Inc.*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). Deliberateness exists only if the employer intended to force the employee to leave. *Id.* Intent may "be inferred through circumstantial evidence, including a failure to act in the face of known intolerable conditions." *Id.* Whether the working conditions were "intolerable" must be assessed "by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign." *Id.*

Plaintiff states that she felt compelled to file for disability retirement and later resign because of the intolerable situation she faced at work. According to plaintiff, her employer's continued refusal to try to accommodate her handicaps and insensitivity regarding her need to take medical and other leave led to an extremely stressful situation at work. Dr. Johnson contends that she was pressured to file for disability retirement. She testified that she felt that everyone at DRG was trying to push her out. She felt that the situation was hopeless and finally submitted her resignation. Defendant argues that a reasonable person would not have felt compelled to resign while an application for disability retirement was pending.

 First, the Court believes that Dr. Johnson was indeed pressured to file for disability retirement. Her employers failed to provide her with the accommodation she required and did not seriously consider her for any alternative positions. Although Dr. Johnson tried every possible avenue of relief, speaking with supervisors on all levels, consulting with handicap specialists and personnel specialists, the only alternative given to her was disability retirement. After filing for disability, Dr. Johnson was pressured to submit to psychiatric evaluations, at which she found out that her supervisor had written an extremely negative appraisal of her. This negative appraisal was a falsified document, purportedly signed by Dr. Johnson herself. At the time, however, Dr. Johnson did not know that the document was backdated and did not contain a true appraisal of her work. This Court believes that a reasonable person in Dr. Johnson's situation may well have felt compelled to resign, even though her disability application was pending. Thus, plaintiff has met the "intolerability" requirement of *Bristow*. Moreover, under *Bristow*, the employer's intent to force the employee to resign may "be inferred through circumstantial evidence, including a failure to act in the face of known intolerable conditions." *Id.* In the instant case, plaintiff's supervisors had ample notice over several months that she needed some changes in her working conditions; however, they failed to act to help her. Thus, under the standard articulated in *Bristow*, this Court finds that plaintiff was constructively discharged from her position.

### B. Sexual Harassment Claim

 Plaintiff has brought a claim of sex discrimination under Title VII based on the theory that sexual harassment created a hostile environment in the workplace and also that her employer retaliated against her for not giving into his sexual demands. Plaintiff asserts the following facts in support of her sexual harassment claim. She states that soon after she started working at DRG, Dr. Hyatt kissed her and said, "I have got to kiss you." Dr. Johnson states that on several occasions from August 1984 through May, 1985, Dr. Hyatt "demanded that she have lunch with him, sit with him in the lunchroom, or visit him in his office to discuss 'global issues.'" She further states that on at least four occasions between July and August, 1984 Dr. Hyatt placed his hands on Dr. Johnson's shoulders and back, which was unwelcome and offensive to her. Dr. Johnson states that on various occasions Dr. Hyatt was unduly critical of her work and complained about her "body language." Dr. Johnson alleges that on April 12, 1985, at the end of an evaluation meeting, Dr. Hyatt em-

braced her. Plaintiff contends that Dr. Hyatt conditioned Dr. Johnson's continued employment on sexual favors, and because plaintiff did not submit, Dr. Hyatt retaliated against her by giving her poor reviews, failing to accommodate her for her handicaps, and denying her requests for leave.

Dr. Hyatt admits to calling Dr. Johnson "Luv." He also admits that this was a term of "affection" that he used only with women and children.[7] He further admits to touching her shoulders on occasion, but never kissing or embracing her. He denies asking her to socialize with him. He admits he discussed "body language" with Dr. Johnson but did not intend any sexual connotation.

From the evidence presented at trial, the Court is unable to determine whether harassment that resulted in a "hostile work environment" took place. The Court agrees with plaintiff that "Luv" is a diminutive term, a most inappropriate way for a supervisor to address an employee. Dr. Hyatt admitted that it was a term of "affection" reserved for women and children. He also admits to touching Dr. Johnson's shoulders on occasion. However, such touching may or may not have been a sexual gesture depending on the circumstances. The Court appreciates Dr. Johnson's sincerity in stating that she found such contact offensive. However, she also testified that she never told Dr. Hyatt that she was offended by his conduct. As for the other allegations, the Court honestly cannot determine whether they did or did not take place. Although their testimony was incompatible in some regards, both Dr. Johnson and Dr. Hyatt appeared credible to the Court. Perhaps there is some truth to both sides of the story.

In *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court held that sexual harassment violates Title VII if it creates a "hostile work environment" or when it takes the form of *"quid pro quo." Id.* at 65–67, 106 S.Ct. at 2404–05. Plaintiff proceeds under both theories. "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the vic-

tim's] employment and create an abusive working environment.'" *Id.* at 67, 106 S.Ct. at 2405. Under the facts clearly established at trial, namely that Dr. Hyatt called plaintiff "Luv" and touched her shoulders on occasion, the Court cannot say that the standard of *Meritor* or "an abusive working environment" is met here. The Court does feel that such conduct may in fact have constituted sexual harassment, but that the conduct was not sufficiently severe or pervasive to violate Title VII.

As for the *quid pro quo* theory, the Court concludes that plaintiff has failed to prove her case. She has not given any particular examples of how Dr. Hyatt conditioned the terms of her employment on sexual favors or socializing.

## III. DAMAGES

■ Having determined that defendant violated the Rehabilitation Act by failing to reasonably accommodate plaintiff, the Court must now assess damages. Plaintiff seeks reinstatement, back pay, front pay and compensatory damages, namely the expenses incurred in her search for a new job.

The Supreme Court has not determined "the extent to which money damages are available under Sec. 504." *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 630, 104 S.Ct. 1248, 1252, 79 L.Ed.2d 568 (1984). However, the Supreme Court did authorize the award of back pay under the Rehabilitation Act as an equitable remedy. *Id.* Although the circuits differ as to whether compensatory damages such as pain and suffering may be recovered, many courts have allowed compensatory damages where there is actual out-of-pocket loss. *See e.g. Disabled in Action v. Mayor & City Council of Baltimore,* 685 F.2d 881, 885 (4th Cir.1982); *Miener v. State of Mo.,* 673 F.2d 969, 977–79 (8th Cir.), *cert. denied,* 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982). In *Liller v. Baltimore County,* 51 FEP Cases 1352, 1989 WL 163577 (D.Md.1990), where the plaintiff was injured by a facility not adequately equipped for the handicapped, Judge Hargrove of this

---

7. Dr. Hyatt is apparently of British origin; he indicated at trial that where he comes from the word "luv" is commonly used to address women and children.

Court found that compensatory damages are available under the Rehabilitation Act. This Court believes that plaintiff is entitled to compensation for her job search costs. However, the accounting provided by plaintiff is rather vague, especially with regard to the phone calls. The Court feels that given this uncertainty, plaintiff must submit further documentation with respect to job search costs.

The Court will direct that plaintiff be reinstated to the same grade level position she previously held at NIH. However, given the history in this case, the Court feels that it would be unproductive to reinstate Dr. Johnson to a position under her previous supervisor. Defendants will be directed to place Dr. Johnson in an appropriate position as soon as possible.

Moreover, plaintiff will be entitled to back pay and front pay up until the date she is reinstated, minus the amount she has earned in mitigation of damages and the amount she has received in worker's compensation and disability benefits. Since leaving DRG, Dr. Johnson earned from various jobs a total of $40,786.69. According to plaintiff's calculations, had she remained at DRG, she would have earned a total of $266,309.08. From this latter sum must be deducted total worker's compensation benefits received from April 22, 1986 to June 9, 1991 of $167,884.00 ($154,884.00 + $13,000.00). From the resulting figure of $98,425.08 must be subtracted what the plaintiff has earned in mitigation of damages, $40,786.69; for a total entitlement of $57,638.39. The Court is aware that defendant attempted to show what the effect would have been if taxes were taken out of this amount. The Court considers this type of computation to be too speculative. Attorneys fees in an amount to be later determined by the Court will also be awarded.

The Court will issue an Order consistent with this Memorandum.