Anita WHITE, Eugene Seals, Bianca Kelly, James Smith, Michelle Miller, Maria Salinas, and all those similarly situated, and the National Association for the Advancement of Colored People, Michigan State Conference, Plaintiffs,

v.

John ENGLER, Governor, State of Michigan, in his official capacity; Michigan Merit Award Board; Mark A. Murray, State Treasurer, in his official capacity; Michigan Department of Treasury; Dorothy Beardmore, President of State Board of Education, in her official capacity; State Board of Education; Arthur E. Ellis, Superintendent of Public Instruction; State Department of Education, Defendants.

No. 00–CV–72882–DT.

United States District Court, E.D. Michigan, Southern Division.

Nov. 19, 2001.

Michael S. Maurer, Daniel Kohrman, Kristan S. Mayer, U.S. Dept. of Justice, Civil Rights Div., Educational Opportunities Section, Washington DC, for U.S.

LaPointe & Assoc., Jeffrey J. Bulter, Okemos MI, for Amicus Michigan Ass'n of Secondary School Principals.

Kary L. Moss, Michael J. Steinberg, American Civil Liberties Union Fund of MI, Detroit, MI, Patricia Mendoza, Marta Delgado, Mexican American Legal Defense Fund, Chicago, IL, Michael Pitt, Peggy Goldberg Pitt, ACLU of MI Cooperating Attys, Royal Oak, MI, Adele P. Kimmel, Trial Lawyers for Public Justice, Washington DC, Judy Martin, ACLU of MI Cooperating Atty., Okemos, MI, for plaintiff.

Elaine F. Fischhoff, Edith C. Harsh, Jane O. Wilensk, Mark S. Meadows, Deborah Garcia-Luna, Educ. Div., Lansing MI, for defendant.

## OPINION

DUGGAN, District Judge.

This is a proposed class action civil rights suit in which Plaintiffs allege that the State of Michigan's Merit Award Scholarship Program perpetuates racial and ethnic bias and discriminates against African Americans, Hispanics, Native Americans, and educationally disadvantaged high school students in direct contravention of Title VI of the Civil Rights Act of 1964 and its implementing regulations, 42 U.S.C. § 2000d and 34 C.F.R. §§ 100.1 *et seq.*, the Equal Protection Clause of the Fourteenth Amendment, and 42 U.S.C. § 1983. This matter is currently before the Court on Defendants' motion to dismiss. For the reasons stated below, Defendants' motion to dismiss shall be denied.

### Background

The Michigan Merit Award Scholarship Program ("the Merit Award Program") was established in 1999. *See* MICH. COMP. LAWS §§ 390.1451–.1459. Under the Merit Award Program, students are eligible for "merit awards" in amounts ranging from $1,000 for approved out-of-state post-secondary educational institutions to $2,500 for approved in-state post-secondary educational institutions. The Merit Award Program is financed exclusively through a trust fund established with the revenues of a multi-state settlement agreement with tobacco manufacturers and private donations to the trust fund. *Id.* § 390.1453.

The Merit Award Program is administered by a seven-member Merit Award

Board ("the Board") within the Department of Treasury, comprised of the State Treasurer, the Superintendent of Public Instruction, the Director of the Department of Career Development, and four members appointed by the Governor. *Id.* § 390.1454. The Board is responsible for developing eligibility criteria and procedures, as well as maintaining a list of approved post-secondary educational institutions.

In general, all students who (1) have graduated from high school or passed a state-approved graduate equivalency examination such as the general educational development ("GED") test, (2) are enrolled in an approved post-secondary educational institution or vocational or technical education program at an approved post-secondary educational institution, and (3) have not been convicted of a felony involving an assault, physical injury, or death, are eligible for a merit award. *Id.* § 390.1457. There are three ways in which to qualify for a merit award, all of which require a Level 1 (Exceeded Michigan Standards) or Level 2 (Met Michigan Standards) score in *at least* two of the subject matter areas of reading, writing, mathematics, and science on the Michigan Education Assessment Program High School Test ("MEAP Test"):[1]

(1) receive a Level 1 or Level 2 score in *each* of the subject areas of reading, writing, mathematics, and science on the MEAP Test;

(2) receive a Level 1 or Level 2 score in *at least two* of the subject areas of reading, writing, mathematics, and science on the MEAP Test *and* receive an over-

all score in the top 25% of a nationally recognized college admission examination such as the SAT or ACT test; or

(3) receive a Level 1 or Level 2 score in *at least two* of the subject areas of reading, writing, mathematics, and science on the MEAP Test *and* receive a qualifying score or scores as determined by the Merit Board on a nationally recognized job skills assessment test designated by the Board.

*See id.* § 390.1457. Although MEAP Test scores are not the sole criteria in each category, eligible students must, at a minimum, receive a Level 1 or Level 2 score in at least two subject areas on the MEAP Test to qualify for a merit award. Therefore, MEAP Test scores are an integral part of the Merit Award Program.

The MEAP Test, developed and administered by the Research, Evaluation, and Assessment Services of the Michigan Department of Education, was created in 1969 by the State Board of Education to provide the Board of Education, the Legislature, local educators, and parents with an assessment of the quality and effectiveness of a school's educational curriculum by measuring overall student performance. *See* MICH. COMP. LAWS § 388.1081; (2d Am. Compl. ¶¶ 41–45 & Ex. F (*Bureau of Res., Evaluation, & Assessment, Mich. Dep't of Educ.*, No. 7, Dec. 1970)). MEAP Tests in math and reading are given in the fourth, seventh, and eleventh grades, and MEAP tests in science, social studies, and writing are given in the fifth, eighth, and eleventh grades.[2]

The first merit awards were based on MEAP Test scores from Spring 1999 (ad-

---

**1.** There are four levels of performance on the MEAP Test: Level 1 (Exceeded Michigan Standards), Level 2 (Met Michigan Standards), Level 3 (At Basic Level), and Level 4 (Below Basic Level).

**2.** The Merit Award Program includes a middle school component, under which seventh graders expecting to graduate from high school in 2005 or after can qualify for an additional $250, $375, or $500 by scoring at Level 1 or Level 2 in at least two subject areas

ministered before the Merit Award Program was enacted). The results were announced in September of 1999 and the first merit awards were awarded to students beginning their post-secondary education in the Fall of 2000.

Of the total number of 66,419 students taking all four subject areas of the MEAP Test in 1999, 56% were white (37,458), 9.6% were African American (6,388), 1.77% were Hispanic (1,175), and 0.8% were Native American (537). (2d Am. Compl., Ex. 1 (Heller Rep. at 2)).[3] Of the 20,138 students who qualified for a merit award,[4] 63% were white (12,170), 2.2% were African American (448), 1.19% were Hispanic (239), and 0.5% were Native American (104).[5] Id. This means that 33.9% of eligible whites, 7.0 % of eligible African Americans, 20.3 % of eligible Hispanics, and 19.4% of eligible Native Americans qualified for merit awards. Id. In addition, 10.1% of the students taking all four subject area tests were from unaccredited public high schools (6,743), of which 4.9% qualified for a merit award (330). In other words, only 1.6% of the 20,138 students who qualified for a merit award were from unaccredited schools. (2d Am. Compl., Ex. 2 (Silver Aff., Table 2)).

Relying on these numbers, Plaintiffs assert that the Merit Award Program "has had a substantial discriminatory impact on African American, Hispanic, and Native American students," as well as "education-ally disadvantaged students, defined as those who attend public high schools deficient in meeting the State accreditation criteria." (2d Am.Compl.¶¶ 35–36). Plaintiffs assert that from the time the Merit Award Program was first proposed in 1999, "the Michigan Legislature, Governor Engler, and the other Defendants had full knowledge of substantial disparities and inequities in the educational curricula among the States 555 school districts, as reflected in MEAP test results and other MEAP data since the program's inception" and that the Merit Board's criteria "were adopted by the Governor and the Michigan Legislature with full knowledge that the criteria would deny scholarships to minority and educationally disadvantaged students who, despite their disadvantage, gained admission to post secondary institutions." (2d Am.Compl.¶¶ 48–49).

On June 27, 2000, Plaintiffs filed a class action complaint against: 1) Governor John Engler, who signed the bill establishing the Merit Award Program; 2) the Merit Award Board; 3) the State Treasurer; 4) the Michigan Department of Treasury, which was entrusted with implementing the Merit Award Program; 5) the President of the State Board of Education; 6) the State Board of Education, which created the MEAP Test; 7) the Superintendent of Public Instruction; and 8) the Department of Education, which administers the MEAP Test.[6] Plaintiffs' original

___

on the MEAP test taken in seventh and eighth grades. See MICH. COMP. LAWS § 390.1457(3).

**3.** Although not mentioned in Plaintiffs' complaint, of the 66,419 students taking all four subject areas of the MEAP Test in 1999, 17,539 did not identify their racial or ethnic group, 1,288 indicated they were "Other," 1068 indicated they were Asian/Pacific Islander, and 966 indicated they were "Multiracial." (See Heller Rep. at 2).

**4.** It is not apparent whether all of these students accepted their merit awards.

**5.** Although not mentioned in Plaintiffs' complaint, of the 20,138 students who qualified for a merit award, 5,659 did not identify their racial or ethnic group, 306 indicated they were "Other," 424 indicated they were Asian/Pacific Islander, and 248 indicated they were "Multiracial." (See Heller Rep. at 2).

**6.** All State officials have been sued in their official capacity.

complaint challenged the Merit Award Program under Title VI of the Civil Rights Act and its implementing regulations on grounds of disparate treatment and disparate impact (First Claim) and the Equal Protection Clause of the Fourteenth Amendment (Second Claim). On September 13, 2000, Plaintiffs filed a first amended complaint adding the National Association for the Advancement of Colored People ("NAACP") as a plaintiff and adding a third claim under 42 U.S.C. § 1983 (Third Claim).

However, on April 24, 2001, the Supreme Court decided *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). As explained in *Sandoval*, § 601 of Title VI prohibits intentional discrimination, and provides that no person shall "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI. *Id.* at 1515. Section 602 "authorizes federal agencies 'to effectuate the provisions of [§ 601] … by issuing rules, regulations, or orders of general applicability.'" *Id.* 34 C.F.R. § 100.3(b)(2) was promulgated in an exercise of that authority, and provides that:

> A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such services, financial aid, other benefits, or facilities will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, *utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin,* or have the effect of defeating or substantially im-

pairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.

(emphasis added).

The *Sandoval* Court stated that it is clear from prior decisions that private individuals may bring an action under Title VI to enforce § 601. *Sandoval*, 121 S.Ct. at 1516. However, the Court determined that Title VI does not "display an intent to create a freestanding private right of action to enforce regulations promulgated under § 602." *Id.* at 1523. Accordingly, after *Sandoval* was issued the parties in this case stipulated to Plaintiffs' filing of a second amended complaint dispensing with their Title VI disparate impact claim.

On June 19, 2001, Plaintiffs filed a second amended complaint asserting claims of intentional discrimination under § 601 of Title VI (First Claim), equal protection under the Fourteenth Amendment (Second Claim), and disparate impact and disparate treatment discrimination under 42 U.S.C. § 1983 (Third Claim). Plaintiffs seek a declaration that the Merit Award Program is invalid, a permanent injunction against use of the MEAP Test in awarding scholarships under the Merit Award Program, an injunction requiring Defendants to implement new, non-discriminatory, criteria for awarding scholarships, and an order requiring Defendants to reevaluate all students denied merit awards under the current criteria.

On July 30, 2001, Defendants filed a motion to dismiss pursuant to Rule 12 of the Federal Rules of Civil Procedure.

*Standard of Review*

Rule 12(b)(1) provides for dismissal for lack of jurisdiction over the subject matter, while Rule 12(b)(6) addresses the failure to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(1) and

12(b)(6). A claim should not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

### Discussion

In their motion to dismiss, Defendants assert that: 1) Eleventh Amendment immunity bars Plaintiffs' claims, 2) Plaintiffs do not have standing to assert this action, and 3) Plaintiffs have failed to state a claim upon which relief can be granted because Title VI does not provide for a private cause of action and because the Merit Award Program does not receive federal funds as required by Title VI. For the reasons discussed below, the Court finds Defendants' arguments to be unavailing.

### I. Plaintiffs' Claims Are Not Barred By Eleventh Amendment Immunity

■ Under the Eleventh Amendment, a state and its agencies are immune from actions for damages and injunctive relief unless immunity is validly abrogated by Congress or expressly waived by the state. *See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54–55, 116 S.Ct. 1114, 1122–23, 134 L.Ed.2d 252 (1996); *Thiokol Corp. v. Department of Treasury, State of Mich., Revenue Div.,* 987 F.2d 376, 381 (6th Cir. 1993). The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. Although on its face the Eleventh Amendment prohibits only suits brought against a state by "Citizens of another State," the Supreme Court has long construed the Amendment to protect states from suits filed by their own citizens in federal court on the basis of federal question jurisdiction. *See Seminole Tribe,* 517 U.S. at 54, 116 S.Ct. at 1122.[7]

■ There are three exceptions to a state's sovereign immunity under the Eleventh Amendment. First, Congress may validly abrogate a state's Eleventh Amendment immunity. *See Popovich v. Cuyahoga County Ct. of Common Pleas, Dom. Rel. Div.,* 227 F.3d 627, 633 (6th Cir.2000) (*reh'g granted and opinion vacated on other grounds* Dec. 12, 2000) (citing *Seminole Tribe,* 517 U.S. at 55, 116 S.Ct. at 1123). Second, a state may waive its Eleventh Amendment immunity by consenting to suit in federal court. *Id.* (citing *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 425–26, 88 L.Ed.2d 371 (1985); *Nelson v. Miller,* 170 F.3d 641, 645–46 (6th Cir. 1999)). Third, the Eleventh Amendment does not bar a suit against a state official seeking prospective injunctive relief to end a continuing violation of federal law. *Id.* (citing *Ex parte Young,* 209 U.S. 123, 167, 28 S.Ct. 441, 457, 52 L.Ed. 714 (1908); *Lawson v. Shelby County, Tenn.,* 211 F.3d 331, 335 (6th Cir.2000)). Plaintiffs' claims fall squarely within these three exceptions.

### A. 42 U.S.C. § 2000d–7 Represents a Valid Abrogation of the State's Eleventh Amendment Immunity

■ Whether Congress validly abrogated the State's Eleventh Amendment immunity under Title VI of the Civil Rights Act involves a two-step inquiry:

---

**7.** The Supreme Court has recently expanded Eleventh Amendment immunity to federal question cases filed in state courts. *See Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).

"(1) 'whether Congress unequivocally expressed its intent to abrogate' the immunity; and (2) 'if it did, whether Congress acted pursuant to a valid grant of constitutional authority.' " *Id.* at 633–34 (quoting *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 120 S.Ct. 631, 640, 145 L.Ed.2d 522 (2000)). As to the first question—whether Congress unequivocally stated its intent to abrogate Eleventh Amendment immunity under Title VI—there is no question that it did. In 42 U.S.C. § 2000d–7(a)(1), Congress specifically states:

A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C.A. § 794], title IX of the Education Amendments of 1972 [20 U.S.C.A. § 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C.A. § 6101 et seq.], *title VI of the Civil Rights Act of 1964* [42 U.S.C.A. § 2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

(emphasis added).

Defendants do not deny that 42 U.S.C. § 2000d–7 constitutes an unequivocal expression of Congress's intent to abrogate the State's Eleventh Amendment immunity. Rather, Defendants contend that Congress did not act pursuant to a valid grant of constitutional authority in doing so. Therefore, the only remaining question is whether 42 U.S.C. § 2000d–7 was passed pursuant to a constitutional provision granting Congress the power to abrogate the State's sovereign immunity.

Section 5 of the Fourteenth Amendment empowers Congress to enact "appropriate legislation" to "enforce" the equal protection clause. U.S. Const. amend. XIV, §§ 1, 5. Consistent with Congress's power under Section 5 of the Fourteenth Amendment is the power to abrogate the State's Eleventh Amendment immunity. *See Seminole Tribe,* 517 U.S. at 72–73, 116 S.Ct. at 1131–32. As the Fifth Circuit explained in *Lesage v. Texas,* 158 F.3d 213, 217, 218–19 (5th Cir.1998), *rev'd on other grounds,* 528 U.S. 18, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999):

Congress unquestionably enacted 42 U.S.C. § 2000d–7 with the "intent" to invoke the Fourteenth Amendment's congressional enforcement power. The purpose of the provision, enacted in 1986, was to legislatively overrule the result in *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). In *Atascadero,* the Court held that Section 504 of the Rehabilitation Act of 1973, which prohibited states from discriminating against the disabled in the administration of federally funded programs, did not contain a sufficiently specific statement of abrogation of Eleventh Amendment immunity to permit suits against states in federal court. *See Atascadero,* 473 U.S. at 245–46, 105 S.Ct. at 3149. Congress instantly recognized the far-reaching implications of this ruling and enacted, as part of the Rehabilitation Act Amendments of 1986, legislation to reverse the result in *Atascadero* and to prevent the application of the reasoning in *Atascadero* to preclude the filing of suits in federal court against states under similar statutes. The Congressional Record contains specific references to exercising congressional power under Section Five of the Fourteenth Amendment to accomplish this abrogation of Eleventh Amendment immunity.

(footnotes omitted). *Accord Franks v. Kentucky Sch. for the Deaf,* 142 F.3d 360, 363 (6th Cir.1998) (finding that § 2000d–7 is valid abrogation of Eleventh Amendment immunity with respect to Title IX claims); *Doe v. Univ. of Ill.,* 138 F.3d 653, 657–60 (7th Cir.1998), *vacated on other*

*grounds,* 526 U.S. 1142, 119 S.Ct. 2016, 143 L.Ed.2d 1028 (1999), *reinstated in pertinent part,* 200 F.3d 499 (7th Cir.1999) (same); *Crawford v. Davis,* 109 F.3d 1281, 1283 (8th Cir.1997) (same).

 Defendants assert that Congress intended to enact Title VI pursuant to its Spending Clause powers and not pursuant to its power under Section 5 of the Fourteenth Amendment and therefore, it had no authority to abrogate the State's Eleventh Amendment immunity. Even if Defendants are correct in their assertion that Congress did not intend or expressly invoke the authority of Section 5 when it enacted § 2000d–7, such omission is not fatal. *Franks,* 142 F.3d at 363 (citing *Timmer v. Michigan Dep't of Commerce,* 104 F.3d 833, 839 (6th Cir.1997); *Crawford,* 109 F.3d at 1283). "The question is whether Congress actually had the authority to adopt the legislation pursuant to that provision, not whether Congress correctly guessed the source of its authority." *Id.* The Court must " 'make an objective inquiry, namely, whether Congress could have enacted the legislation at issue pursuant to a constitutional provision granting it the power to abrogate.' " *Id.* (quoting *Crawford,* 109 F.3d at 1283). "As long as Congress had such authority as an objective matter, whether it also had the specific intent to legislate pursuant to that authority is irrelevant.' " *Id.*

The Court is satisfied that 42 U.S.C. § 2000d–7 represents a legitimate exercise of Congress's power under Section 5 of the Fourteenth Amendment and therefore, validly abrogates the State's Eleventh Amendment immunity from suit under Title VI.

### B. Defendants Have Consented to Suit in Federal Court Under Title VI by Accepting Federal Funds

 Defendants' Eleventh Amendment immunity argument also fails because by accepting federal funds, Defendants have consented to suit in federal court under Title VI. Incident to Congress's power under the Spending Clause is the power to " 'attach conditions on the receipt of federal funds ... to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.' " *Sandoval v. Hagan,* 197 F.3d 484, 492 (11th Cir.1999) (quoting *South Dakota v. Dole,* 483 U.S. 203, 207, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987)), *rev'd on other grounds sub. nom., Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). "Specifically, under the Spending Clause power, the federal government may condition a waiver of state sovereign immunity upon the receipt of federal monies." *Id.* (citing *Atascadero,* 473 U.S. at 238 n. 1, 105 S.Ct. at 3145 n. 1).

 For there to be a waiver of Eleventh Amendment immunity under the Spending Clause, there must be an "unequivocal indication" that the State has consented to federal jurisdiction—either " 'by the most express language or by such overwhelming implication from the text as (will) leave no room for any other reasonable construction.' " *Id.* at 493 (quoting *Edelman,* 415 U.S. at 673, 94 S.Ct. at 1361 (internal quotation omitted)). To satisfy this requirement, a statute must evince a "clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity." *Atascadero,* 473 U.S. at 247, 105 S.Ct. at 3149–50.

As previously stated, 42 U.S.C. § 2000d–7(a)(1) explicitly waives state sovereign immunity: "[A] State shall not be immune under the Eleventh Amendment ... from suit in Federal Court for a violation ... of Title VI ... or the provisions of any other Federal statute prohibiting discrimination

by recipients of Federal financial assistance." A number of courts have found that § 2000d–7's plain language manifests an unmistakable intent to condition receipt of federal funds on the State's waiver of sovereign immunity. *See Sandoval,* 197 F.3d at 493–94 (citing *Lane v. Pena,* 518 U.S. 187, 200, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) (drawing this conclusion in the context of a parallel Title IX provision); *Little Rock v. Mauney,* 183 F.3d 816, 821–22 (8th Cir.1999) (finding Section 2000d–7 to constitute an immunity waiver for Section 1403 of the IDEA, a parallel provision to the Title VI waiver); *Marie O. v. Edgar,* 131 F.3d 610, 617–18 (7th Cir.1997) (same); *Clark v. California,* 123 F.3d 1267, 1271 (9th Cir.1997) (finding Section 2000d–7 to constitute a state immunity waiver for Section 504 of the Rehabilitation Act of 1973, a parallel provision to the Title VI waiver)).

Defendants do not dispute that the Department of Education, the Department of Treasury, and the State Board of Education are direct recipients of federal funds. Consistent with the authority cited above, the Court is satisfied that Defendants have waived their sovereign immunity by accepting federal funds.

*C. Plaintiffs' Claims Under the Fourteenth Amendment Against the State Officials For Prospective Injunctive Relief Are Not Barred by the Eleventh Amendment*

■ "Under the doctrine of *Ex parte Young,* suits against state officials seeking equitable relief for ongoing violations of federal law are not barred by the Eleventh Amendment." *Telespectrum, Inc. v. Public Serv. Com'n of Ky.,* 227 F.3d 414, 419 (6th Cir.2000) (citing *Michigan Bell Tel. Co. v. Climax Tel. Co.,* 202 F.3d 862 (6th Cir.2000)). The *Ex parte Young* doctrine "is an 'essential part' of Eleventh Amendment jurisprudence, and must be upheld 'if the Constitution [i]s to remain the su-

preme law of the land.' " *Id.* (quoting *Alden,* 527 U.S. at 747, 119 S.Ct. at 2263). " 'An allegation of an on-going violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction.' " *Id.* (quoting *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 281, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997)).

Plaintiffs have brought suit for injunctive and declaratory relief against state officials in their official capacities, not for money damages. Even if it could be said that Plaintiffs seek to challenge the constitutionality of the Merit Award Program itself, MICH. COMP. LAWS §§ 390.1451–.1459, and not Defendants' enforcement of the Program, Plaintiffs claims for injunctive and declaratory relief would nonetheless fall within the *Ex parte Young* doctrine, even though the State would be the real party in interest. *See Nelson,* 170 F.3d at 646; *Akella v. Michigan Dep't of State Police,* 67 F.Supp.2d 716, 722 (E.D.Mich. 1999). Because Plaintiffs seek prospective injunctive and declaratory relief only, their claims fall within the *Ex parte Young* exception to sovereign immunity.

In summary, Defendants' arguments that Eleventh Amendment immunity bars Plaintiffs' claims against them must be rejected. The Court is satisfied that Plaintiffs' claims fall squarely within the three well-known exceptions to Eleventh Amendment immunity.

*II. Plaintiffs Have Standing to Bring Suit*

■ Standing is an essential element of Article III's case or controversy requirement. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Standing consists of three elements: (1) injury-in-fact, (2) a causal relationship between the conduct complained of and the injury, and (3) a

strong likelihood that the injury can be redressed by judicial action. *Id.* at 560–61, 112 S.Ct. 2130. Defendants contend that Plaintiffs are unable to establish all three of these requirements.

■■■ To meet the injury-in-fact requirement, Plaintiffs must show that they have sustained or are immediately in danger of sustaining some direct injury as a result of the current Merit Award Program criteria. The "injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983); *see also Kelley v. Selin,* 42 F.3d 1501, 1508 (6th Cir. 1995).

Defendants contend that Plaintiffs do not have standing because they do not indicate whether they took advantage of retest opportunities or whether they have pursued all opportunities to qualify for a merit award.[8] Defendants also argue that the fact that Plaintiffs may not be able to attend the college of first choice because they did not receive a merit award is not a sufficient injury-in-fact. According to Defendants, "[t]he failure to attend a college of one's choice, for whatever reason, is simply too speculative to form a basis for decision-making." (Defs.' Br. at 23).

Plaintiffs allege that they have been denied the opportunity to compete on equal footing for merit award scholarships because of their race, *i.e.,* because use of the MEAP Test as a criteria has a disparate impact against them. The Court is satisfied that this loss or impairment of opportunity is a sufficient injury-in-fact. *See University of Cal. Regents v. Bakke,* 438 U.S. 265, 281 n. 14, 98 S.Ct. 2733, 2743 n. 14, 57 L.Ed.2d 750 (1978) (stating that student had suffered injury-in-fact by vir-

tue of university's decision not to allow plaintiff to compete for all places in class simply because of his race); *Podberesky v. Kirwan,* 764 F.Supp. 364, 367–68 (D.Md. 1991) (finding that Hispanic college student had standing to challenge scholarship program open only to black students because student was denied opportunity to compete for scholarship solely because of his race), *rev'd on other grounds,* 956 F.2d 52 (4th Cir.1992); *Sharif v. New York State Educ. Dep't,* 709 F.Supp. 345, 356 (S.D.N.Y.1989) (finding allegation that plaintiff's chances of winning a state merit scholarship were reduced by state's practice of basing such awards solely on SAT scores and that, therefore, they were less likely to receive benefits such as substantial public recognition, enhanced ability to attract additional scholarships, and increased opportunity to attend the college or university of their choice, was sufficient to establish injury-in-fact).

■■■ Plaintiffs must also establish that the injury is "fairly traceable" to the challenged actions of Defendants and that it is likely that the injury will be redressed by a favorable decision. *Cleveland Branch, NAACP v. City of Parma,* 263 F.3d 513, 523–24 (6th Cir.2001) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 693–94, 145 L.Ed.2d 610 (2000)). Defendants contend that Plaintiffs have not established causation because they have failed to demonstrate any disparate impact and because one-third of the demographic information is not yet available.

■■■ As discussed supra, a Level 1 or Level 2 score on at least two subject areas on the MEAP Test is required to qualify for a merit award. As further discussed

---

8. As a result of when the MEAP Test is scheduled, students have a minimum of four oppor-

tunities to qualify for a merit award.

*supra,* current data indicates that 33.9% of eligible whites qualified for merit awards, whereas only 7.0 % of eligible African Americans, 20.3 % of eligible Hispanics, and 19.4% of eligible Native Americans qualified for merit awards. In this Court's opinion, Plaintiffs have sufficiently established that the injury, *i.e.,* the failure to qualify for a merit award, can be fairly traced to Defendants' actions, *i.e.,* reliance on the MEAP Test as the main criteria for awarding the scholarships.

The Court also rejects Defendants' contention that "[i]f the Court grants plaintiffs the relief they seek, plaintiffs will not receive any scholarship monies. In fact, no one will receive such monies from that point forward." (Defs.' Br. at 25). Plaintiffs do not seek to have the entire Merit Award Program eliminated; rather Plaintiffs seek only to have the Merit Award Program restructured to eliminate the allegedly discriminatory criteria. The Court is satisfied that Plaintiffs have standing to pursue such action.

The Court is also satisfied that the NAACP has standing to pursue this action on behalf of its members. An association may obtain " 'standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' " *Cleveland Branch, NAACP,* 263 F.3d at 524 (quoting *Friends of the Earth, Inc.,* 528 U.S. at 181, 120 S.Ct. at 694). As discussed above, the Court is satisfied that the NAACP's individual members would have standing to sue on their own. Furthermore, in this Court's opinion, the interests at stake in this suit are germane to the NAACP's organizational purpose, *i.e.,* confronting and eliminating racial discrimination. Finally, the declaratory and in-

junctive relief sought by Plaintiffs does not require participation of the NAACP's individual members. Accordingly, the Court is satisfied that the NAACP has standing to represent its members' interests in this suit.

III. *Plaintiffs May Bring an Action Under § 1983 Asserting a Violation of Rights Contained in the Disparate Impact Regulations Promulgated Under Title VI*

Next, Defendants contend that under the Supreme Court's decision in *Sandoval,* Plaintiffs cannot maintain a private cause of action under Title VI's disparate impact regulations. The Court notes that Plaintiffs withdrew their Title VI claim alleging a violation of Title VI's disparate impact regulations when they filed their second amended complaint. Plaintiffs now assert a claim of intentional discrimination under § 601 of Title VI, 42 U.S.C. § 2000d. (*See* 2d Am. Compl., First Claim). Plaintiffs have also asserted a § 1983 claim, claiming a violation of their rights contained in Title VI's disparate impact regulations.

Plaintiffs agree that under *Sandoval,* there is no private right of action to enforce Title VI's disparate impact regulations under Title VI itself. However, Plaintiffs maintain that they can still bring a private action under § 1983 to enforce rights contained in Title VI's disparate impact regulations. The Court agrees.

In *Sandoval,* a majority of the Court found that "[n]either as originally enacted nor as later amended does Title VI display an intent to create a *freestanding* private right of action to enforce regulations promulgated under § 602," and therefore held that no such right of action exists. *Sandoval,* 121 S.Ct. at 1523 (emphasis added). However, the majority did not foreclose the use of a § 1983 action as a vehicle to

enforce rights found within the disparate impact regulations.[9]

Section 1983 provides, in relevant part, as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983. "By its terms, § 1983 creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir.2000) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

■■■■ To state a viable § 1983 claim, Plaintiffs must allege that: 1) they were deprived of a right, privilege, or immunity secured by the Federal Constitution or laws of the United States, and 2) the deprivation was caused by a person while acting under color of state law. *See Flagg Bros. v. Brooks*, 436 U.S. 149, 155–57, 98 S.Ct. 1729, 1732–34, 56 L.Ed.2d 185 (1978); *Brock v. McWherter*, 94 F.3d 242, 244 (6th Cir.1996). Defendants do not argue that

they are not "persons acting under the color of state law" within the meaning of § 1983.[10] Therefore, the issue to be determined is whether the regulation at issue, 34 C.F.R. § 100.3(b)(2), defines a right enforceable under § 1983.

■■■ "In *Maine v. Thiboutot*, 448 U.S. 1, 6–8, 100 S.Ct. 2502, 2505–06, 65 L.Ed.2d 555 (1980), the Supreme Court recognized that plaintiffs may use Section 1983 to enforce not only constitutional rights, but also those rights defined by federal statutes. As federal regulations have the force of law, they likewise may create enforceable rights." *Loschiavo v. City of Dearborn*, 33 F.3d 548, 551 (6th Cir.1994). The factors a court should consider in determining whether a regulation defines a right enforceable under § 1983 "include: (1) whether the provision was intended to benefit the plaintiff; (2) whether the provision creates a binding obligation on the governmental unit, rather than merely expressing a congressional preference; and (3) whether the interest asserted is sufficiently specific as to be within the competence of the judiciary to enforce." *Id.* (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 509, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990)).

Plaintiffs are African Americans, Hispanics, and Native Americans. "It is axiomatic that Congress's purpose in enacting the Civil Rights Act of 1964 was to prohibit discrimination against individuals on the

---

9. Indeed, the dissent in *Sandoval* went as far as to state that "to the extent that the majority denies relief to the respondents merely because they neglected to mention 42 U.S.C. § 1983 in framing their Title VI claim, this case is something of a sport. Litigants who in the future wish to enforce the Title VI regulations against state actors in all likelihood must only reference § 1983 to obtain relief." *Sandoval*, 121 S.Ct. at 1527.

10. The Court notes that although state officials literally are "persons," officials acting in

their official capacities are not considered "persons" under § 1983 when sued for damages because such a suit is, in essence, a suit against the state. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). However, the Supreme Court has recognized that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.' " *Id.* at n. 10, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45.

basis of race, color, or national origin." *South Camden Citizens in Action v. New Jersey Dept. of Envtl. Protection*, 145 F.Supp.2d 505, 530 (D.N.J.2001). As explained during the introduction of Title VI:

> "Simple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination. Direct discrimination by Federal, State, or local governments is prohibited by the Constitution. But indirect discrimination, through the use of federal funds, is just as invidious."

*Id.* (quoting 109 Cong. Rec. 11161 (1963)). In this Court's opinion, there can be little doubt that Title VI and its regulations were intended to benefit Plaintiffs, *i.e.*, African Americans, Hispanics, and Native Americans.

To create an enforceable right, the statute must also "unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." *Id.* (citing *Blessing v. Freestone*, 520 U.S. 329, 340–41, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569 (1997)); *see also Loschiavo*, 33 F.3d at 552. The regulations promulgated under Title VI state that "*[n]o person* in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program to which this part applies," 34 C.F.R. § 100.3(a) (emphasis added), that recipients of federal funds "*may not*" directly discriminate based upon race, *id.* § 100.3(b)(1) (emphasis added), "*may not* ... utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin," *id.* § 100.3(b)(2) (emphasis added), and "*may*

*not* make selections with the effect of excluding individuals from ... any programs to which this regulation applies, on the ground of race, color, or national origin," *id.* § 100.3(b)(3) (emphasis added). The Court is satisfied that such language is sufficiently couched in mandatory terms as to create an unambiguous obligation on the States. *See Citizens in Action*, 145 F.Supp.2d at 536–37.

The third requirement under the enforceable rights test requires that the asserted interest be sufficiently specific to be judicially enforceable. There can be no dispute that there is ample precedent interpreting the civil rights statutes, including Title VI. *See id.* at 533–35 (citing cases). "This Court need not speculate about judicial competence to enforce federal regulations prohibiting disparate impact discrimination, promulgated pursuant to Title VI, because a substantial body of case law already exists which demonstrates the capacity of the federal judiciary to perform exactly this analysis." *Id.* at 540 (citing cases).

In this Court's opinion, 34 C.F.R. § 100.3(b)(2) sets forth an enforceable right under § 1983. Accordingly, Plaintiffs have met their burden in alleging a proper § 1983 claim.

## IV. Defendants Fall Within the Definition of "Program or Activity" under Title VI

42 U.S.C.A. §§ 2000d provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under *any program or activity receiving Federal financial assistance.*

(emphasis added). To maintain a private right of action under 42 U.S.C. § 2000d, Plaintiffs must first establish that the pro-

gram from which they have been excluded, i.e., the Merit Award Program, constitutes a "program or activity receiving Federal financial assistance." *See* 42 U.S.C. § 2000d.

The parties do not dispute that the Merit Award Program receives no federal funds. Plaintiffs, however, contend that it is sufficient that the Department of Treasury, which administers the Merit Award Program and oversees the Merit Award Board, receives federal funds.

As is relevant in this case, the term "program or activity" is defined as: *"[A]ll of the operations of ...* a department, agency, special purpose district, or other instrumentality of a State or of a local government ... any part of which is extended Federal financial assistance." 42 U.S.C. § 2000d–4a(1)(A). "This definition is inclusive. For example, '[i]f the office of a mayor receives federal financial assistance and distributes it to local departments or agencies, all of the operations of the mayor's office are covered along with the departments or agencies which actually get the aid.'" *Thomlison v. City of Omaha,* 63 F.3d 786, 789 (8th Cir.1995) (quoting *Schroeder v. City of Chicago,* 927 F.2d 957, 962 (7th Cir.1991)).

This definition of "program or activity," enacted as part of the Civil Rights Restoration Act of 1987, was intended to overrule the Supreme Court's "program specific" definition in *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984):

> In *Grove City College,* ... the Supreme Court interpreted section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681(a) (1982), prohibiting sex discrimination in "any education program or activity receiving Federal financial assistance" to mean that only the particular program or activity receiving federal grant money had to comply with the Title IX prohibition

against sex discrimination.... In *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984), the Supreme Court stated that the ban on discrimination against the handicapped in section 504 was also limited "to the specific program that receives federal funds." ...

> On March 22, 1988, Congress enacted the Civil Rights Restoration Act of 1987, Pub.L. No. 100–259, 102 Stat. 28 (1988). The stated purpose of the statute is to "restore the broad scope of coverage and to clarify the application of ... section 504 of the Rehabilitation Act of 1973 ...." Pub.L. 100–259, 102 Stat. 28. Congress found that the Supreme Court had unduly narrowed the application of section 504 and that it was "necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered." Restoration Act §§ 2 (to be codified at 20 U.S.C. §§ 1687 note). The Restoration Act amended section 504 of the Rehabilitation Act in part by defining the term "program or activity" as "all the operations of ... an entire corporation, partnership, or other private organization, or an entire sole proprietorship ... which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation ...." Restoration Act §§ 4(b)(3)(A)(ii) (to be codified at 29 U.S.C. §§ 794(b)(3)(A)(ii)). The Restoration Act overrules *Grove City College v. Bell* and *Consolidated Rail Corp. v. Darrone* by prohibiting discrimination against the handicapped on an institution-wide basis, instead of only in connection with the limited program or activity actually receiving federal funds, if any federal funds are received by any program or activity of the institution.

*Leake v. Long Island Jewish Med. Ctr.,* 695 F.Supp. 1414, 1415–16 (E.D.N.Y.1988).

Under the current definition of "program or activity," the "program specific" approach advanced by Defendants must be rejected. The Court must look beyond the Merit Award Program itself to determine whether Defendants' activities fall within § 2000d. Defendants do not dispute that the Department of Treasury, the Board of Education, and the Department of Education receive federal funds. Therefore, "all of the operations" of these departments are a "program or activity" for purposes of Title VI, including the Merit Award Program and Merit Award Board, which are an operation of the Department of Treasury. *See Thomlison,* 63 F.3d at 789 (finding fire division that did not receive federal funds to be "program or activity" under § 2000d because it was division of public safety division, which itself and other divisions within it, received federal funds); *Horner v. Kentucky,* 43 F.3d 265, 271 (6th Cir.1994) ("The legislative history describes the effect of the amendments, stating that the definitions of 'program or activity' and 'program' 'make clear that discrimination is prohibited throughout entire agencies or institutions if any part receives Federal financial assistance.'" (quoting S.Rep. No. 64, 100th Cong., 2d Sess. 4, *reprinted in* 1988 U.S.C.C.A.N. 3, 6)); *Radcliff v. Landau,* 883 F.2d 1481, 1483 (9th Cir.1989) ("Receipt of federal financial assistance by any student or portion of a school thus subjects the entire school to Title VI coverage.").

### Conclusion

For the reasons stated above, Defendants' motion to dismiss shall be denied. An Order consistent with this Opinion shall issue forthwith.